1

Magistrate Judge Benton

2

3

FILED
LODGED
ENTERED
RECEIVED

4

NOV 17 2004

5

BY WESTERN DISTRICT OF WASHINGTON
CLERK U.S. DISTRICT COURT
AT SEATTLE
DEPUTY

6

UNITED STATES DISTRICT COURT

7

WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

UNITED STATES OF AMERICA,

)

MAGISTRATE'S DOCKET NO.
CASE NO. 04-643 M

Plaintiff,

)

10

)

COMPLAINT for VIOLATION of

v.

)

U.S.C. Title 18, Sections 371,

11

)

1344 and 922(g)(1)

12

KARIM ABDULLAH ASSALAAM,
aka Darrell Lee Dunn,

)
)

13

ATTAWWAAB MUHAMMAD FARD,
ALI MUHAMMAD BROWN, and

)
)

14

HERBERT CHANDLER SANFORD,

)

04-MJ-00643-CMP

)

15

Defendants.

)

16

17

BEFORE, United States Magistrate Judge Monica J. Benton,
United States Courthouse, Seattle, Washington

18

The undersigned complainant being duly sworn states:

19

### COUNT 1

20

(Conspiracy to Commit Bank Fraud)

21

A.   The Offense

22

1.   Beginning in or about January 2002 and continuing until the present within

23

the Western District of Washington and elsewhere, KARIM ABDULLAH ASSALAAM

24

("ASSALAAM"), ATTAWWAAB MUHAMMAD FARD ("FARD"), ALI

25

MUHAMMAD BROWN ("BROWN"), and HERBERT CHANDLER SANFORD

26

("SANFORD") and others known and unknown did knowingly and wilfully combine,

27

conspire, and agree to devise and execute a scheme and artifice to defraud U.S. Bank,

28

Bank of America, Key Bank, Washington Mutual Bank, Wells Fargo Bank, and Boeing

1 Employees Credit Union, ("The Banks") all financial institutions as defined by Title 18,

2 United States Code, Section 20, for the purpose of obtaining moneys, funds, merchandise

3 and credits under the custody and control of The Banks, by means of false and fraudulent

4 pretenses, representations and promises, in violation of Title 18, United States Code,

5 Sections 1344 and 2.

6 B.   Purpose of the Conspiracy

7     2.     The purpose of the conspiracy was to fraudulently obtain funds from The

8 Banks by depositing counterfeit checks into the defendant's own bank accounts and into

9 other individuals bank accounts with the knowledge and assistance of the account holders

10 and then withdrawing funds from these accounts before the checks were returned as

11 uncollectible.

12     3.     It was also a purpose of the conspiracy to purchase cashier's checks in the

13 names of fictitious individuals; create counterfeit cashier's checks payable to the same

14 individuals and then cash the counterfeit cashier's checks at various check cashing

15 businesses, using counterfeit identification documents in the name of the payee appearing

16 on the counterfeit cashier's checks.

17 C.   Manners and Means of the Conspiracy

18     4.     It was part of the conspiracy that ASSALAAM, FARD, and BROWN

19 recruited other individuals to facilitate the scheme.

20     5.     It was further part of the conspiracy that ASSALAAM would create

21 counterfeit checks purportedly drawn on legitimate commercial bank accounts.

22     6.     It was further part of the conspiracy that ASSALAAM, FARD, BROWN,

23 and SANFORD would deposit or caused to be deposited the counterfeit checks into the

24 defendant's or co-conspirator's bank accounts.

25     7.     It was further part of the conspiracy that after the counterfeit checks were

26 deposited into the defendant's or co-conspirator's bank account and funds were

27 withdrawn from these accounts before the deposited checks were determined to be

28 fraudulent.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

8.    It was further part of the conspiracy to create counterfeit cashier's checks in the name of fictitious individuals and then cash these checks with the use of false identification documents.

D.    <u>Overt Acts</u>

In furtherance of the conspiracy, the following overt acts were committed within the Western District of Washington and elsewhere by one or more conspirators:

1.    Between January 14, 2002, and January 17, 2002, three counterfeit checks were deposited into ASSALAAM's bank account at Washington Mutual Bank.

2.    Between January 14, 2002, and January 17, 2002, three counterfeit checks were deposited into FARD's bank account at Washington Mutual Bank.

3.    On or about July 22, 2002, ASSALAAM recruited another individual ("CI-1") to participate in the conspiracy by obtaining CI-1's U.S. Bank bank card and Personal Identification Number ("PIN").

4.    Between on or about July 22, 2002, and July 28, 2002, ASSALAAM deposited or caused to be deposited five counterfeit checks totaling $9,889 into CI-1's bank account.

5.    Between on or about July 22, 2002 and July 28, 2002, ASSALAAM withdrew or caused to be withdrawn $7,424.68 from CI-1's bank account via ATM withdrawals or point of sale transactions.

6.    On or about July 28, 2002, ASSALAAM provided $1,500 in cash to CI-1 as payment for the fraudulent use of CI-1's bank account.

7.    On or about August 30, 2002, CI-1 provided a Key Bank bank card to FARD.

8.    Between February 27, and 28, 2003, four counterfeit checks were deposited into SANFORD's bank account at the Boeing Employees Credit Union.

9.    On or about January 14, 2004, BROWN attempted to cash a counterfeit check purportedly drawn on the Wells Fargo bank account of "Nurselink, Inc." at a Bank of America Branch in Kent, Washington.

10.     On or about April 26, 2004, FARD attempted to obtain official bank stock paper from a Wells Fargo Bank teller, in University Place, Washington.

11.     In or about late May or early June 2004, ASSALAAM, FARD and BROWN went to SANFORD's apartment for the purpose of having SANFORD create a counterfeit identification document.

12.     On or about November 5, 2004, BROWN obtained a Wells Fargo Bank sheet of blank official bank check paper.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2 THROUGH 9

### (Bank Fraud)

1.     Beginning in or about January 2002, and continuing until the present, within the Western District of Washington and elsewhere, KARIM ABDULLAH ASSALAAM ("ASSALAAM"), ATTAWWAAB MUHAMMAD FARD ("FARD"),, ALI MUHAMMAD BROWN ("BROWN"), HERBERT CHANDLER SANFORD ("SANFORD") and others known and unknown did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud U.S. Bank, Bank of America, Key Bank, Washington Mutual Bank, Wells Fargo Bank and Boeing Employees Credit Union ("The Banks") all financial institutions as defined by Title 18, United States Code, Section 20, and to obtain moneys, funds, and credits under the custody and control of The Banks, by means of false and fraudulent pretenses, representations and promises, as more particularly set forth in Count 1 of the Complaint, which is incorporated by reference as if fully set forth herein.

2.     On or about the below-listed dates, within the Western District of Washington, for the purpose of executing and attempting to execute this scheme and artifice to defraud The Banks, ASSALAAM, FARD, SANFORD, and BROWN conducted and caused to be conducted the below-listed transactions:

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

| COUNT | DATE | VICTIM BANK/ LOCATION OF TRANSACTION | TRANSACTION | AMOUNT |
|---|---|---|---|---|
| 2 | 01/14/02 | Washington Mutual Bank/ Lynnwood, WA | Deposit of counterfeit check No. 1004 drawn on account of "RPS NW" | $3,191.00 |
| 3 | 01/17/02 | Washington Mutual Bank/ Lynnwood, WA | Deposit of counterfeit check No. 1009 drawn on account of "RPS NW" | $4,119.00 |
| 4 | 12/09/02 | Bank of America/ Seattle, WA | Deposit of counterfeit check No. 98114 drawn on account of "CA Wholesale" | $  995.95 |
| 5 | 02/27/03 | Boeing Employees Credit Union/ Seattle, WA | Deposit of counterfeit check No. 120999 drawn on account of "North Pacific Ins." | $1,701.01 |
| 6 | 01/14/04 | Bank of America/ Kent, WA | Attempted deposit of counterfeit check No.4853 drawn on account of "Nurselink, Inc." | $1,486.53 |
| 7 | 09/09/04 | Key Bank/ Tukwila, WA | Deposit of counterfeit check No. 1076629 drawn on account of "Westlake Financial Services" | $  943.27 |
| 8 | 09/13/04 | Key Bank/ Tukwila, WA | Deposit of counterfeit check No. 1076649 drawn on account of "Westlake Financial Services" | $  924.17 |
| 9 | 09/16/04 | Key Bank/ Kent, WA | ATM withdrawal | $  300.00 |

3.     The offenses charged in Counts 2 through 9 were committed during and in furtherance of the conspiracy charged in Count 1.

All in violation of Title 18, United States Code, Sections 1344 and 2.

<u>COUNT 10</u>
(Felon In Possession of a Firearm)

On or about July 6, 2002, at Seattle, within the Western District of Washington, KARIM ABDULLAH ASSALAAM, having previously been convicted of crimes punishable by imprisonment for a term exceeding one year, that is:

    1.    Violation of Uniformed Controlled Substance Act - Possession of Cocaine in King County Superior Court, State of Washington, cause number 88-1-02882-2, on October 17, 1988; and

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101-1271
(206) 553-7970

2.     Violation of Uniformed Controlled Substance Act - Possession of Cocaine in King County Superior Court, State of Washington, cause number 89-1-03486-3, on December 1, 1989;

did knowingly possess in and affecting interstate commerce two firearms, that is, one Astra Model A-100 9mm pistol, serial number SA-3759D and one Astra Model A-100 9mm pistol, serial number SA-3513D each of which had been shipped and transported in interstate commerce.

All in violation of Title 18, United States Code, Sections 922(g)(1) and 924(e).

And the complainant states that this Complaint is based on the following information:

1.     I, Frederick C. Gutt, am a Special Agent with the Federal Bureau of Investigation (FBI), assigned to the Seattle office and have served in that capacity for six years. In that position, I am responsible for investigating violations of federal criminal laws, including bank fraud.

2.     This affidavit is made in support of arrest warrants for KARIM ABDULLAH ASSALAAM ("ASSALAAM"), ATTAWWAAB MUHAMMAD FARD ("FARD"), ALI MUHAMMAD BROWN ("BROWN"), and HERBERT CHANDLER SANFORD ("SANFORD") for conspiracy in violation of Title 18 United States Code, Section 371, Bank Fraud in violation of Title 18 United States Code Section 1344 and Felon in Possession of a Firearm (ASSALAAM only) in violation of Title 18, United States Code Section 922(g)(1).

3.     This Affidavit is also made in support of applications for search warrants to search the following locations for fruits, evidence, and instrumentalities of violations of federal law, as more fully described in Attachment D, which is incorporated herein by reference:

    a.     The residence of ASSALAAM located at 25108 112th Avenue SE, Apartment 7, Kent, Washington 98030 and further described in Attachment A;

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1            b.     The residence of FARD, located at 3660 Bridgeport Way W.,

2                   Apartment C-102, University Place, Washington 98466 and further

3                   described in Attachment B;

4            c.     The residence of SANFORD, located at 23240 88th Avenue S.,

5                   Apartment KK-303, Kent, Washington 98031 and further described

6                   in Attachment C; and

7            d.     A black four door 1994 Lexus LS-400, VIN JT8UF11E5R0192544,

8                   Washington tag 654-H2S.

9      4.     This Affidavit is also made in support of an application for a warrant to

10 seize, a black, four door, 1994 Lexus LS-400, VIN JT8UF11E5R0192544, Washington

11 tag 654-HZS, purchased by FARD for $10,000.00 in cash on March 11, 2004. There is

12 probable cause to believe that FARD's automobile was purchased with proceeds from the

13 bank fraud scheme.

14      5.     The information contained in this affidavit is based on my personal

15 knowledge, training, and experience, as well as information related to me by others

16 involved in the investigation of ASSALAAM and his associates, FARD, BROWN, and

17 SANFORD.

18                             SUMMARY OF SCHEME

19      6.     As set forth below, I believe that ASSALAAM and his associates are

20 engaging in a bank fraud scheme, involving both counterfeit business checks and

21 counterfeit cashier's checks.

22      7.     In the counterfeit business check scheme, a "victim" coconspirator is

23 recruited to volunteer their bank debit card and related personal identification number

24 ("PIN"). Counterfeit business checks are then created and deposited into the "victim"

25 account or the defendant's own account. Before the counterfeit checks are returned and

26 the account is frozen, the debit card is used to withdraw cash from the account via

27 withdrawals from automated teller machines ("ATM") and point of sale cash-back

28 transactions. After the account is frozen and can no longer be used to perpetuate the

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  scheme, the "victim," or defendant using their own account, reports their card as lost or
2  stolen.

3      8.    In the counterfeit cashier's check scheme, a co-conspirator purchases a
4  cashier's check from a bank, made payable to an individual for which supporting
5  counterfeit identification has been made. The original check is first counterfeited, then
6  cashed to recover the funds used to purchase it. Soon thereafter, the counterfeit cashier's
7  checks are cashed at various check cashing businesses, which are more likely to accept
8  such "official bank checks" than personal or unknown business checks. This scheme can
9  be perpetuated until the original cashier's check is recorded as having been cashed, or an
10  alert is issued advising that such particular check number has been counterfeited.
11  Whereas the counterfeit business check scheme encounters daily ATM withdrawal limits
12  and per transaction point of sale cash-back limits, the counterfeit cashier's check scheme
13  yields the full amount of each counterfeited check that is cashed, less a check cashing fee.

14      9.    Based on FBI inquiries, I have determined that the deposits of U.S. Bank,
15  Bank of America, Key Bank, Washington Mutual Bank, Wells Fargo Bank and Boeing
16  Employees Credit Union, were federally insured from January 2002 through the present.

17  SUBJECTS OF THE INVESTIGATION

18      10.    KARIM ABDULLAH ASSALAAM was born on December 30, 1968.
19  ASSALAAM, FARD and BROWN are believed to be half-brothers, all born to the same
20  mother, Al-Hadee Muhammad Jameelah Fard, formerly known as Katherine Virginia
21  Brown and born April 15, 1953. ASSALAAM is believed to be married to "Karima
22  Assalaam," whose true identity is unknown. Further Karima is believed to also use the
23  aka's of "Jenny Aguirre" and "Nakiata R. Banks." ASSALAAM is believed to be the
24  leader and organizer of the conspiracy and fraud scheme. He is believed to have recruited
25  other individuals and is believed to have created counterfeit business checks and cashier's
26  checks. ASSALAAM is a convicted felon having been convicted of two felonies -
27  possession of cocaine in 1988 and possession of cocaine in 1989, for which he was
28  sentenced to ninety (90) days in jail and thirty (30) months in prison, respectively.

1         11.     ATTAWWAAB MUHAMMAD FARD was born on February 25, 1980.

2 FARD is believed to be the half-brother of ASSALAAM and BROWN having been born

3 to the same mother Al-Hadee Muhammad Jameelah Fard, formerly known as Katherine

4 Virginia Brown, DOB April 15, 1953. FARD is believed to assist Assalaam with the

5 bank fraud scheme by depositing counterfeit checks, withdrawing proceeds from the

6 accounts into which the counterfeit checks have been deposited, and recruiting facilitators

7 of the scheme such as sources of "victim" bank cards, official bank check stock, and

8 identity information. FARD was arrested for homicide and convicted of manslaughter by

9 the State of Oklahoma in 1997, for which he was sentenced to fifteen (15) years in prison

10 but has since been released to supervision.

11         12.     ALI MUMAMMAD BROWN was born on December 12, 1984. BROWN

12 is believed to be half-brother to ASSALAAM and FARD, all born to the same mother,

13 Al-Hadee Muhammad Jameelah FARD, formerly known as Katherine Virginia BROWN

14 and born April 15, 1953. BROWN is believed to assist ASSALAAM with the bank fraud

15 scheme by depositing counterfeit checks, withdrawing proceeds from the accounts into

16 which the counterfeit checks have been deposited, and recruiting facilitators of the

17 scheme such as sources of "victim" bank cards, official bank check stock, and identity

18 information.

19         13.     HERBERT CHANDLER SANFORD was born on February 14, 1970.

20 SANFORD is believed to be an associate of ASSALAAM who produces counterfeit

21 identification documents for use in the bank fraud scheme. Additionally, an unidentified

22 individual believed to reside in California is also believed to be another associate of

23 ASSALAAM who produces counterfeit identification documents for use in the bank

24 fraud scheme. SANFORD is a convicted felon having been convicted of two felonies,

25 each for possession of illegal drugs by the State of Washington in 1990 and 1998, for

26 which he was sentenced to prison for twenty-seven (27) months and thirty (30) months,

27 respectfully.

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1 | RESULTS OF THE INVESTIGATION

2 | **A.   Deposit of Counterfeit Checks into ASSALAAM and FARD's Accounts**

3 |     14.   I have learned from Washington Mutual Bank ("WAMU") that

4 | ASSALAAM opened a WAMU bank account on September 11, 2001, and FARD opened

5 | a WAMU bank account on November 1, 2001. During the period January 14, 2002,

6 | through January 17, 2002, the Washington Mutual Bank ("WAMU") accounts of

7 | ASSALAAM and FARD were simultaneously subjected to counterfeit check fraud

8 | activity. Deposited into ASSALAAM's account were three counterfeit checks, numbered

9 | 1009, 1010, and 1011, in the amount of $4,119.00, $4,213.00, and $4,516.00,

10 | respectively, all dated January 13, 2002, and all drawn on a Bank of America ("BoA")

11 | account of "RPS NW". Deposited into FARD's account during this same period were

12 | three counterfeit checks, numbered 1004, 1008, and 1020, in the amount of $3,191.00,

13 | $3,115.00, and $3,517.00, respectfully, dated January 13, 13, and 17, 2002, respectively,

14 | and all drawn on the same BoA account of "RPS NW". The three counterfeit checks that

15 | were deposited into ASSALAAM's account during this period totaled $12,848.00,

16 | resulting in a $7,709.49 loss to WAMU from ATM withdrawals and point of sale

17 | transactions conducted during this same period. The three counterfeit checks that were

18 | deposited into FARD's account during this period totaled $9,823.00, resulting in a

19 | $6,410.25 loss to WAMU from ATM withdrawals and point of sale transactions.

20 | **B.   Information Obtained from Confidential Informant 1**

21 |     15.   In July 2002, a reliable individual whose information has been consistently

22 | corroborated and who is an FBI Confidential Informant ("CI-1"), provided information

23 | on a African-American male known as "Hakim" or "Abdul Karim" who was attempting to

24 | recruit individuals, including CI-1 to participate in a bank fraud scheme. The individual

25 | known as "Hakim" or "Abdul Karim" was later identified as ASSALAAM. On December

26 | 4, 2002, CI-1 positively identified ASSALAAM (via Washington State Drivers License

27 | #ASSALKA325RT) from a photo montage as the individual involved in the bank fraud

28 | scheme with whom he/she has been dealing with. Initially CI-1 believed the subject was

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  known as "Hakim" instead of "Karim." CI-1 was convicted of assault in Washington in

2  1996, second degree robbery in California in 1998 and first degree burglary in

3  Washington in 2001. CI-1 has been paid approximately $3,000.00 per month, for the

4  support of his family, since he began providing full time assistance to the FBI in July

5  2002.

6      16.   On July 22, 2002, equipped with a recording device, CI-1 provided his/her

7  U.S. Bank bank card ("Card 1") and corresponding PIN to ASSALAAM for use in

8  ASSALAAM's bank fraud scheme. During this same meeting, ASSALAAM explained

9  that his "whole Muslim crew" is involved in an ongoing bank fraud scheme and that they

10  are raising funds not only for personal gain, but because "you can't go to war broke."

11     17.   On July 25, 2002, CI-1 placed a recorded telephone call to ASSALAAM at

12  (206) 250-9699, a number previously provided to CI-1 by ASSALAAM. During this

13  telephone call, ASSALAAM advised that he would be finished with Card 1 later that

14  week. Telephone records obtained identified the subscriber of (206) 250-9699 as "Karim

15  A. ASSALAAM", with a Social Security Number known to be associated with

16  ASSALAAM.

17     18.   On July 28, 2002, CI-1 met with ASSALAAM, who encouraged CI-1 to

18  obtain additional bank cards for use in his bank fraud scheme and provided CI-1 with

19  $1,500.00 cash as CI-1's share of the proceeds for Card 1. CI-1 subsequently provided

20  the cash to the FBI. I have learned from U.S. Bank that between July 22, 2002, and July

21  28, 2002, five counterfeit checks totaling $9,889.00 were deposited into the U.S. Bank

22  account of Card 1, and $7,424.68 was withdrawn from it via ATMs and point of sale

23  transactions, which loss has been reimbursed by the FBI.

24     19.   On July 30, 2002, CI-1 retrieved two recorded telephone messages from

25  ASSALAAM requesting CI-1 to call him back at (206) 406-2434. Telephone records

26  obtained identified the subscriber of (206) 406-2434 as "Attawwaab M. Sard", with a

27  Social Security Number known to be associated with FARD. CI-1 then placed a recorded

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1   telephone call to (206) 406-2434 and spoke with ASSALAAM.  During this telephone
2   call, ASSALAAM directed CI-1 to call his/her bank and report Card 1 as stolen.

3       20.   On August 2, 2002, equipped with a recording device,  CI-1 provided an
4   FBI-supplied Bank of America bank card ("Card 2") and corresponding PIN to
5   ASSALAAM for use in his bank fraud scheme.

6       21.   On August 7, 2002, CI-1 spoke briefly with ASSALAAM in an unrecorded
7   telephone call.  During this telephone call, ASSALAAM advised CI-1 that Card 2 did not
8   work and that he had been advised by one of his associates that cards from Bank of
9   America would not work in the bank fraud scheme.  CI-1 later placed a recorded
10  telephone call to ASSALAAM at (206) 250-9699.  During this telephone call, CI-1 asked
11  if ASSALAAM still had Card 1 in his possession.  ASSALAAM said he would check,
12  and advised CI-1 to attempt to obtain bank cards from Wells Fargo, U.S. Bank, and any
13  of the credit unions, as bank cards from Bank of America and Washington Mutual Bank
14  would not work in the bank fraud scheme.

15      22.   On August 8, 2002, with CI-1 equipped with a recording device,
16  ASSALAAM advised CI-1 that Bank of America was alert to the fraud scheme and for
17  that reason Card 2 was unsuccessful.  ASSALAAM directed CI-1 to notify the owner of
18  the card to call the bank and report the card as lost.  I have learned from Bank of America
19  that one counterfeit check in the amount of $1,700.00 was deposited into the Bank of
20  America account of Card 2, but no funds were able to be withdrawn.

21      23.   On August 30, 2002, CI-1 placed a recorded telephone call to ASSALAAM
22  at (206) 250-9699.  During this telephone call, CI-1 advised ASSALAAM that he/she had
23  another bank card for him and agreed to meet with ASSALAAM.  Equipped with a
24  recording device, CI-1 met later in the day with ASSALAAM and ASSALAAM's brother
25  and provided an FBI-supplied Key Bank bank card ("Card 3") and corresponding PIN for
26  a fictitious account created by Key Bank to ASSALAAM's brother, known as "Abdul" or
27  "Abdul Taweed", for use in the bank fraud scheme.  ASSALAAM's brother, known as
28  "Abdul" or "Abdul Taweed," was later identified as FARD.  On August 26, 2003, CI-1

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   positively identified FARD (via Washington State Driver's License FARD*AM207C5)

2   as the individual CI-1 knew as "Abdul" or "Abdul Taweed."

3       24.   Later on August 30, 2002, CI-1 again placed a recorded telephone call to

4   ASSALAAM at (206) 250-9699.  During this telephone call, ASSALAAM advised CI-1

5   that Card 3, which was an ATM card and not a debit card, would not work in the bank

6   fraud scheme.  ASSALAAM explained that the scheme used debit cards, which allow for

7   both ATM withdrawals and point of sale transactions, and wanted to return the card to

8   CI-1.

9       25.   On September 6, 2002, CI-1 placed a recorded telephone call to

10   ASSALAAM at (206) 250-9699.  During this telephone call, CI-1 advised ASSALAAM

11   that he/she had another bank card for him and discussed meeting later.  Equipped with a

12   recording device, CI-1 met later in the day with ASSALAAM and provided an FBI-

13   supplied U.S. Bank bank card ("Card 4") and corresponding PIN to ASSALAAM for use

14   in the bank fraud scheme.

15       26.   On September 9, 2002, CI-1 placed a recorded telephone call to

16   ASSALAAM at (206) 250-9699.  During this telephone call, ASSALAAM advised CI-1

17   that Card 4 was invalid.  ASSALAAM suggested that CI-1 give the card back to the

18   owner to validate it and then provide it to him again.

19       27.   On September 11, 2002, CI placed a recorded telephone call to

20   ASSALAAM at (206) 250-9699.  During this telephone call, CI-1 advised ASSALAAM

21   that he/she had another bank card for him and agreed to meet later in the day.  Later in the

22   afternoon, CI-1 placed another recorded telephone to ASSALAAM at (206) 250-9699

23   and they agreed to meet at the Southcenter shopping mall in Tukwila, Washington.

24   Equipped with a recording device, CI-1 met later in the day with ASSALAAM and

25   FARD at the Southcenter mall and provided an FBI-supplied Key Bank bank card ("Card

26   5") and corresponding PIN to ASSALAAM.  CI-1 then saw ASSALAAM provide the

27   card to FARD.  Also, during this meeting, ASSALAAM returned Card 4 to CI-1 as they

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

had discussed on September 9, 2002, and advised that a female was currently conducting the bank fraud scheme by making purchases inside the mall.

28.    On September 13, 2002, CI-1 placed a recorded telephone call to ASSALAAM at (206) 250-9699.  During this telephone call, CI-1 asked ASSALAAM if Card 5 was working and ASSALAAM replied "..so far, so good."

29.    On September 17, 2002, CI-1 again placed a recorded telephone call to ASSALAAM at (206) 250-9699.  During this telephone call, ASSALAAM advised CI-1 never to turn down an available bank card for use in the bank fraud scheme, and that he was out of town but to contact his brother (who CI-1 understood to be FARD) if he/she obtained another bank card.

30.    On September 23, 2002, CI-1 placed a recorded telephone call to ASSALAAM at (206) 250-9699.  During this telephone call, ASSALAAM instructed CI-1 to have Card 5 reported as stolen and to keep in contact with his brother, FARD, when he is out of town.

31.    On September 25, 2002, CI-1 met with ASSALAAM, who provided CI-1 with $700.00 cash as CI-1's share of the proceeds for Card 5.  CI-1 subsequently provided the $700.00 cash to FBI.  I have learned from Key Bank that between September 11, 2002 and September 23, 2002, four counterfeit checks totaling $5,600.12 were deposited into the KeyBank account of Card 5.  During this same period $5,116.95 was withdrawn from it via ATMs and point of sale transactions, which loss was reimbursed by the FBI.

32.    On October 10, 2002, equipped with a recording device, CI-1 provided an FBI-supplied U.S. Bank bank card ("Card 6") and corresponding PIN to ASSALAAM for use in his bank fraud scheme.

33.    On October 22, 2002, CI-1 met with ASSALAAM, who provided CI-1 with $1,000.00 cash as CI-1's share of the proceeds for Card 6.  CI-1 subsequently provided the $1,000.00 cash to FBI.  I have learned from U.S. Bank that between October 10, 2002 and October 22, 2002, five counterfeit checks totaling $6,938.54 were deposited into the

1 │ U.S. Bank account of Card 6, and $6,914.80 was withdrawn from it via ATMs and point

2 │ of sale transactions, which loss was reimbursed by the FBI.

3 │     34.    On October 23, 2002, with CI-1 equipped with a recording device,

4 │ ASSALAAM explained how he is careful to erase everything off his laptop after he

5 │ finishes with it. ASSALAAM continued that someone could retrieve what was on his

6 │ laptop, but it would take so much effort that "the only way they'll do that is if you hit 'em

7 │ for a billion dollars. You only hit 'em for a couple hundred thousand, it ain't worth it!"

8 │ **C.    FBI Surveillance and Trash Recovery - December 2002**

9 │     35.    On July 6, 2002 Seattle Police Department ("SPD") executed a search

10 │ warrant at a residence located at 5200 23rd Avenue SW, Seattle, Washington. Based on

11 │ this search, SPD determined that ASSALAAM, FARD, and BROWN were residing at

12 │ this residence.

13 │     36.    On December 9, 2002, FBI surveillance initiated in the vicinity of 5200

14 │ 23rd Avenue SW in Seattle identified a black Mercedes Benz, Washington tag 313-MOH

15 │ ("WA 313-MOH"), and a beige Cadillac, Washington tag 607-JSS ("WA 607-JSS"),

16 │ parked in front. WA 607-JSS was then registered to FARD and Reshema Thomas, and

17 │ later sold to a scrap processor in February 2004. WA 313-MOH was then registered to a

18 │ Slayman Appadolo; however, as set forth below at paragraph 62, ASSALAAM was

19 │ believed to be the actual user of this vehicle at that time and until May 2004.

20 │     37.    At approximately 10:48 am, on December 9, 2002, FBI surveillance

21 │ observed a black male depart in the beige Cadillac WA 607-JSS, which was registered to

22 │ FARD. At approximately 11:00 am, this individual was observed using a Boeing

23 │ Employee Credit Union ("BECU") ATM located at 6540 California Avenue SW in

24 │ Seattle. Information from BECU identified this transaction to be associated with

25 │ counterfeit check fraud in the account of BECU customer Jessica L. Fuller. At

26 │ approximately 11:06 am, WA 607-JSS returned to the area of 5200 23rd Avenue SW.

27 │     38.    At approximately 3:44 pm, WA 313-MOH departed from 5200 23rd

28 │ Avenue SW. At approximately 3:54 pm, a black male (later identified as ASSALAAM)

1 exited the passenger side of WA 313-MOH and proceeded to use a BoA ATM located at

2 9916 17th Avenue SW in Seattle. Information from BoA identified all four transactions

3 conducted at this time to be associated with counterfeit check fraud in the accounts of

4 BoA customers Younes Mubarak Alrasheedi, Khaleeq Ulfat Abdul-Aziz, Said A.

5 Mohamed, and  Phane Vongsaveng, including the deposit of a counterfeit check at this

6 same time period and same ATM into the account of Phane Vongsaveng. That check was

7 payable to "PHANE VONGSAVENG" in the amount of $995.95, numbered 981114,

8 dated December 9, 2002, and drawn on a BoA account of "C A WHOLESALE". At

9 approximately 4:06 pm, the passenger returned to and entered the passenger side of WA

10 313-MOH, which then departed the area.

11      39.      On December 13, 2002, abandoned property was recovered in the trash

12 from 5200 23rd Avenue SW in Seattle, including a VersaCheck generated check

13 remittance for a check number "981118" from "C A WHOLESALE". VersaCheck is a

14 retail software program used to create personal or business checks. A counterfeit check

15 numbered "981118" from "C A WHOLESALE" was deposited into the account of Said

16 A. Mohamed in the evening on December 9, 2002, after FBI surveillance on that date

17 terminated.

18 **D.      Deposit of Counterfeit Checks Into SANFORD's Bank Account**

19      40.      I have learned from Boeing Employee's Credit Union ("BECU") that

20 Sanford  opened an account at BECU on November 18, 2002, which experienced little to

21 no activity until February 2003. At the time Sanford opened this account he was provided

22 with a debit card and a PIN number. Deposited into this account were four counterfeit

23 checks, numbered 120999, 121000, 121001, and 121002, in the amount of $1,701.01,

24 $1,700.01, $1,700.01, and $1,691.01, dated February 27, 27, 28, and 28, 2003,

25 respectively, and all drawn on the same Union Bank of California account of "NORTH

26 PACIFIC Ins."  Funds were then withdrawn from this account resulting in a financial

27 loss. On March 11, 2003, Sanford reported to BECU this his bank card had been stolen.

28 BECU showed SANFORD surveillance photographs associated with these transactions

1    but he advised that he was unable to identify the individual depicted in those photographs.

2    I have looked at the photographs and they do not appear to be photographs of SANFORD.

3    **E.      May 30, 2003, Arrest of ASSALAAM and Search of Vehicle**

4    41.      On May 30, 2003, ASSALAAM was driving the black Mercedes Benz, WA

5    313-MOH when stopped in Seattle by a SPD Officer for not having a front license plate

6    on the vehicle. After being stopped ASSALAAM was arrested on traffic charges. In a

7    search of ASSALAAM'S vehicle, WA 313-MOH. incident to arrest, SPD found a Wells

8    Fargo bank card in the name of "Jenny Aguirre", which ASSALAAM said belonged to

9    his wife. Officer's also found a California Drivers License in the name of Morcy D.

10   Cleveland but which appeared to have ASSALAAM's picture on it, and believed by SPD

11   to be counterfeit. WA 313-MOH was impounded and searched on May 30, 2003

12   pursuant to a search warrant. From this search, SPD seized property as evidence,

13   including:

14          a.      A counterfeit check payable to "Jenny Aguirre" in the amount of

15   $946.18, numbered 28603, dated May 16, 2003, and drawn on a KeyBank account of

16   "TELECOM SYSTEMS, INC." I have learned from Wells Fargo Bank that on April 9,

17   2003, at the Wells Fargo Bank branch in Tukwila, an individual identifying herself as

18   Jenny Aguirre opened account number 186-8526151, which was closed after being

19   subjected to counterfeit check fraud. That fraud included the deposit into it of a

20   counterfeit check payable to "Jenny Aguirre" in the amount of $946.18, numbered

21   220999, dated May 27, 2003, and drawn on a Union Bank of California account of

22   "NORTH PACIFIC Ins.", and another payable to "Jenny Aguirre" in the amount of

23   $992.02, numbered 19951, dated May 27, 2003, and drawn on a Bank of New York

24   account of "FOCUS TRAVEL"; and an unauthorized - possibly stolen and forged - equity

25   line of credit check payable to "Jenny Aguirre" in the amount of $8,900.00, numbered

26   1011, dated April 13, 2003, and drawn on the BofA account of a Mr. Lido Wu.

27          b.      A counterfeit check, partially obliterated but believed to be payable

28   to "VALARIE R TONEY", in the amount of $1,400.00, numbered 61922, dated

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1   September 13, 2002, and drawn on a Commerce Bank account of "Enterprise L.C."

2   "VALARIE R TONEY" is the fictitious name associated with the account for Card 5.  As

3   explained above, at paragraph 32, four counterfeit checks were deposited into this

4   account between September 11, 2002 and September 23, 2002.  Each of these checks was

5   drawn on the Commerce Bank account of "Enterprise L.C. and each was made payable to

6   Valarie R. Toney. The numbers on the checks were 61921, 61923, 61925, and 61929, in

7   the amount of $1,400.00, $1,400.00, $1,400.12, and $1,400.00, and dated September 12,

8   13, 15, and 17, 2002, respectively.

9          c.     California Drivers Licenses in the names of Morey D. Cleveland and

10   Richard P. Lewis, but which appear to have ASSALAAM's picture on them.

11          d.     Bank cards in the names of Jenny Aguirre, Karim ASSALAAM, The

12   Game Inc., Morey D. Cleveland, Richard P. Lewis, William Mobley and Marti A. Kelty.

13          e.     13 ATM deposit envelopes from BECU; 3 ATM deposit envelopes

14   from BoA; and one ATM deposit envelope from Washington Mutual Bank (1);

15          f.     Compaq Presario model 17XL30 laptop computer with serial number

16   5YOAFP765323 ("laptop").

17          g.     A March 2003 receipt for Public Storage unit H-10 located at 10404

18   Martin Luther King Way S. in Seattle, which reflected that ASSALAAM, FARD,

19   BROWN, and their mother were identified thereon as authorized users.

20   **F.**     **June 19, 2003 Search of Public Storage Unit H-10**

21        42.     On June 19, 2003, SPD executed a search warrant at Public Storage unit H-

22   10 located at 10404 Martin Luther King Way S. in Seattle, for which ASSALAAM,

23   FARD, BROWN, and their mother were identified as authorized users.  From this search,

24   SPD seized property as evidence, including:

25          a.     a counterfeit check payable to "HERB C. SANFORD" in the amount

26   of $1,700.01, numbered 120995, dated February 27, 2003, and drawn on a Union Bank of

27   California account of "NORTH PACIFIC Ins." As explained above at paragraph 40,

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  similar counterfeit checks were deposited into SANFORD's BECU account on February

2  27 and 28, 2003.

3          b.      Sony model PCV-7733 personal computer with no visible serial

4  number ("PC").

5  **G.    Examination of Seized Computers**

6          43.     On July 2, 2003, SPD requested FBI assistance with examination of the

7  laptop seized from ASSALAAM's vehicle on May 30, 2003 and the PC seized from the

8  storage locker on June 19, 2003. The laptop and PC were imaged by the FBI and returned

9  to SPD, who then returned the PC and laptop to ASSALAAM. Subsequent examination

10  by FBI found a VersaCheck program and database on each of these computers. On the

11  laptop, the database was found to contain information to support the creation of thirty-five

12  (35) checks drawn on the Bank of America account from "WEST COAST BEAUTY

13  SUPPLY" thirty-four (34) between $900.00 and $1,000.00; and one payable to "THE

14  GAME", for $3,000.00. On the PC, the database was found to contain information to

15  support the creation of seventy-four (74) checks from "W C BEAUTY SUPPLY",

16  "WASHINGTON MEDICAL CENTER," "SKILLPATH INC.," all between $900.00 and

17  $1,000.00. Also found in the database on the PC was a reference to "PHANE

18  VONGSAVENG". Phane Vongsaveng was the name on one of the BoA accounts

19  associated with counterfeit check fraud transactions observed by FBI surveillance on

20  December 9, 2002. (See paragraph 38 above.)

21  **H.    BROWN'S Arrest - January 14, 2004**

22          44.     On January 14, 2004, BROWN was arrested by the Kent Police Department

23  for forgery in connection with his attempt on that date to deposit a counterfeit business

24  check at a drive through BoA branch in Kent. BROWN was attempting to deposit a

25  counterfeit check in the amount of $1,486.53, numbered 4853, dated January 12, 2004,

26  and drawn on a Wells Fargo Bank account of "NURSELINK, INC." No charges are

27  pending at the state level against BROWN relating to this incident.

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

**I.      FARD's Purchase of Lexus - March 11, 2004**

45.      Based on an interview of the seller by law enforcement agents and review of documents, I have determined that on March 11, 2004, FARD purchased a black, four door, 1994 Lexus LS-400, VIN JT8UF11E5R0192544, Washington tag 654-HZS ("WA 654-HZS"), for $10,000.00 cash. According to inquiry of FARD's probation officer on October 13, 2004, FARD reported that he is employed at "Sweet Spot Fragrances" in Seattle, with a telephone number for his place of employment to be (206) 250-9699. However, this is the telephone number previously identified by CI-1 to be for ASSALAAM's cellular telephone. Telephone company records also identify ASSALAAM to be the subscriber for this cell number. FARD has no record of wages in the State of Washington according to a check of the Washington State Employment Security Department on October 6, 2004; no record of welfare benefits in the State of Washington according to a check of the Washington State Department of Social and Health Services on October 11, 2004, and no other known legal source of income.

**J.      Fard's Attempt to Obtain Check Paper - April 26, 2004**

46.      On April 26, 2004, FARD entered the Wells Fargo Bank branch in University Place and asked the teller to speak with her after work. The teller, who attends the same mosque as Fard and knows his wife, Sarah, agreed. When they met, FARD asked the teller if she had access to official bank check stock and if she was interested in making some money. He explained that he was looking for "cashier's paper", and said "All you need to do is bring me that document and I will personally give you one hundred thousand dollars for it." The teller responded that she did not have access to it. FARD concluded by asking her not to tell anyone about their conversation.

**K.      CI-1's Encounter with ASSALAAM and FARD - Summer 2004**

47.      In the summer of 2004, CI-1 became reacquainted with ASSALAAM and his associates involved in the bank fraud scheme. On July 27, 2004, equipped with a recording device, CI-1 met with ASSALAAM and FARD. During this meeting,

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1 │ ASSALAAM asked CI-1 to find him a white female to travel with ASSALAAM to assist
2 │ in the bank fraud scheme.

3 │     48.    On July 28, 2004, equipped with a recording device, CI-1 again met with
4 │ ASSALAAM and FARD, who were with a Hispanic male identified as Jacob Santos
5 │ Martinez ("Martinez"), born April 30, 1985. During this meeting, ASSALAAM
6 │ discussed which banks are favorable and unfavorable for targeting in the bank fraud
7 │ scheme. After this meeting, FBI surveillance observed FARD, ASSALAAM and
8 │ Martinez in a 1994 Lexus, Washington tags 654-HZS, which FARD had purchased on
9 │ March 11, 2004, travel to the Wells Fargo Bank located inside of Safeway grocery at
10 │ 4011 S. 164th Street in Seatac, Washington. Martinez was then observed entering the
11 │ bank and, at approximately 6:18 pm, was observed to be sitting down and speaking with a
12 │ teller.

13 │     49.    On July 30, 2004, I interviewed the teller at Wells Fargo Bank who had
14 │ spoken with Martinez in the evening on July 28, 2004, who recalled that Martinez cashed
15 │ a cashier's check that he had purchased at their same branch approximately two weeks
16 │ earlier. The cashier's check was for $1,100.00, made payable to "Nakiata Banks", and
17 │ numbered 0190303840. Martinez was allowed to cash the check as he still had the
18 │ purchase receipt, and because the teller remembered selling it to him previously. The
19 │ teller also recalled that this same check was associated with a counterfeit Washington
20 │ Drivers License that was seized on July 27, 2004. On that date, a woman with a
21 │ Washington Drivers License in the name of Nakiata R. Banks attempted to cash this
22 │ check in the branch; however, the drivers license was determined to be counterfeit and
23 │ seized by the bank, after which the woman grabbed the check and left the bank. The
24 │ seized drivers license was provided to FBI as evidence.

25 │     50.    On September 7, 2004, CI-1 placed a recorded telephone call to
26 │ ASSALAAM at (206) 250-9699. During this telephone call, CI-1 advised ASSALAAM
27 │ that he/she had another bank card for him and agreed to meet later in the day. Equipped
28 │ with a recording device, CI-1 met later in the day with ASSALAAM, who traveled to the

1  meeting in FARD's Lexus, WA 654-HZS. During the meeting, CI-1 provided an FBI-
2  supplied Key Bank bank card ("Card 7") for a fictitious account created by Key Bank and
3  corresponding PIN to ASSALAAM for use in the bank fraud scheme.

4       51.    On September 8, 2004, CI-1 placed a recorded call to ASSALAAM at (206)
5  250-9699. During this telephone call, CI-1 provided ASSALAAM with the account
6  number and address associated with Card 7, as ASSALAAM had previously requested.

7       52.    On September 9, 2004, FBI surveillance initiated in the vicinity of 25108
8  112th Avenue SE, Apartment 7, in Kent, believed to be ASSALAAM and Karima's
9  residence, observed FARD arrive in WA 654-HZS. FARD, ASSALAAM, and an
10  unidentified female - believed to be Karima, were later observed departing from the
11  residence in WA 654-HZS, and last seen at approximately 4:26 pm heading southbound
12  on Rainier Avenue S. near SW 7th Street in Renton, Washington. At approximately 4:43
13  pm at the nearby Key Bank Andover Park ATM in Tukwila, a counterfeit check in the
14  amount of $943.27, numbered 1076629, dated August 27, 2004, and drawn on a
15  Comerica Bank & Trust account of "WESTLAKE FINANCIAL SERVICES", was
16  deposited via ATM into the account of Card 7. Between approximately 4:52 pm and 5:02
17  pm, $260.00 from three separate transactions was withdrawn from the account of Card 7
18  at the nearby 633 Southcenter ATM in Tukwila. The PIN number provided to
19  ASSALAAM was used in making these withdrawals.

20       53.    On September 13, 2004, FBI surveillance initiated in the vicinity of
21  ASSALAAM and Karima's residence observed ASSALAAM and an unidentified female,
22  believed to be Karima, depart the residence and travel by bus to the vicinity of the Key
23  Bank Andover Park ATM in Tukwila. At approximately 3:27 pm, FBI surveillance
24  observed the female believed to be Karima approach and use the ATM, which is located
25  outside on the north side of the Key Bank branch. Corresponding to this same time
26  period and at this same ATM, a counterfeit check in the amount of $924.17, numbered
27  1076649, dated August 27, 2004, and drawn on a Comerica Bank & Trust account of
28  "WESTLAKE FINANCIAL SERVICES", was deposited into the account of Card 7 and

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   $100.00 cash was withdrawn from same.  ASSALAAM and the female believed to be
2   Karima are then observed entering Southcenter Mall.  At approximately 3:43 pm, FBI
3   surveillance observed the female believed to be Karima approach and use the 633
4   Southcenter ATM in Tukwila, which is located inside of the mall on the west side of the
5   Bon Marche department store.  Corresponding to this same time period and at this same
6   ATM, $200.00 cash was withdrawn from the account of Card 7.  ASSALAAM and the
7   female believed to be Karima are then observed exiting Southcenter Mall and departing
8   the vicinity in a taxicab.

9        54.    On September 15, 2004, FBI surveillance initiated in the vicinity of
10   ASSALAAM and Karima's residence observed ASSALAAM and an unidentified female,
11   believed to be Karima, depart the vicinity and travel by bus to the vicinity of the Key
12   Bank Andover Park ATM in Tukwila.  At approximately 5:14 pm, FBI surveillance
13   observed the female believed to be Karima approach and use the ATM.  Corresponding to
14   this same time period and at this same ATM, a counterfeit check in the amount of
15   $934.18, numbered 1076659, dated August 27, 2004, and drawn on a Comerica Bank &
16   Trust account of "WESTLAKE FINANCIAL SERVICES", was deposited into the
17   account of Card 7 and $300.00 cash was withdrawn from same.  FBI surveillance
18   photographs of the female believed to be Karima at the ATM (from the back) and ATM
19   surveillance photographs of the individual conducting these transactions at the same time
20   (from the front), appear show the same person.  ASSALAAM and the female believed to
21   be Karima were then observed entering Southcenter Mall, then later departing the vicinity
22   in a taxicab.

23        55.    On September 16, 2004, FBI surveillance initiated in the vicinity of
24   ASSALAAM and Karima's residence observed ASSALAAM depart the residence and
25   travel by bus to the vicinity of the US Bank ATM inside of the Fred Meyer department
26   store on James Street SE and 102nd Avenue SE in Kent.  At approximately 4:37 pm, FBI
27   surveillance observed ASSALAAM put a white hood up over his head and stand in front
28   of the ATM.  Corresponding to this same time period and at this same ATM, $300.00

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  cash was withdrawn from the account of Card 7, through use of a PIN number which had
2  previously been provided to ASSALAAM. At approximately 4:52 pm, ASSALAAM was ·
3  then observed purchasing items inside of this Fred Meyer. Corresponding to this same
4  time period and at this merchant location, a $248.37 point of sale purchase transaction
5  was recorded to the account of Card 7. ASSALAAM was then observed returning to his
6  residence, which he was observed entering at approximately 5:18 pm.

7  　　56.    On September 19, 2004, CI-1 met with ASSALAAM and FARD and
8  ASSALAAM gave CI-1 $500.00 in cash as CI-1's share of the proceeds for use of Card 7.
9  CI-1 subsequently provided the $500.00 cash to FBI. Between September 9, 2004 and
10  September 16, 2004, three counterfeit checks totaling $2,801.62 were deposited into the
11  Key Bank account of Card 7, and $2,654.64 was withdrawn from it via ATMs and point
12  of sale transactions, which loss the FBI intends to reimburse.

13  **L.    Information Provided by Confidential Informant 2**

14  　　57.    In February 2003, a reliable individual whose information has been
15  consistently corroborated and who is an FBI Confidential Informant ("CI-2") also began
16  providing information on ASSALAAM. CI-2 was verbally advised by the United States
17  Attorneys Office for the Western District of Washington that he/she would not be
18  prosecuted in connection with the bank fraud scheme involving ASSALAAM so long as
19  he/she was forthright and provided truthful information regarding same. The FBI has
20  also provided funds to CI-2 as reimbursement for living expenses, totalling $2,563.19.
21  CI-2 met ASSALAAM in late June 2002 and was "married" to him in December 2002;
22  however, CI-2 and ASSALAAM are not believed to be legally married under State of
23  Washington law, and according to CI-2 separated late in February 2003 after CI-2 said
24  she was physically assaulted by ASSALAAM.

25  　　58.    Since CI-2 met ASSALAAM in late June 2002, CI-2 has known that
26  ASSALAAM used the black Mercedes Benze, WA 313-MOH and believed he owned the
27  car. CI-2 once saw a handgun in the trunk of ASSALAAM's car, which ASSALAAM
28  later said was one of the guns seized by SPD from his West Seattle residence.

1  ASSALAAM later advised CI-2 that he had heard nothing more from SPD regarding that

2  incident and presumed the matter was resolved with the seizure of the guns. CI-2 has not

3  known ASSALAAM to possess a firearm since the SPD seizure of guns from his West

4  Seattle residence.

5       59.    CI-2 became aware of the bank fraud scheme in which ASSALAAM was

6  involved, which he refers to as "The Game." ASSALAAM explained to CI-2 that "The

7  Game" was acceptable since the bank card owners provide their cards as willing

8  participants. Prior to becoming an FBI Confidential Informant, CI-2 assisted

9  ASSALAAM in the bank fraud scheme by:

10            a.    providing him with his/her own personal bank card and PIN on two

11                 occasions. On both occasions the account was frozen/closed before

12                 any withdrawals/loss;

13            b.    endorsing a couple of checks in the name of others at ASSALAAM's

14                 request;

15            c.    using cards in the names of other individuals that ASSALAAM had

16                 provided to conduct point of sale cash-back transactions on four

17                 occasions; and

18            d.    providing him with an employer business check.

19       60.    Although CI-2 did not do so, ASSALAAM also requested CI-2 to open

20  accounts at other banks in her name and to find friends that have bank accounts that have

21  been open for at least six months.

22       61.    CI-2 has witnessed ASSALAAM inside his prior residence at 5200 23rd

23  Avenue SW wearing plastic gloves while inserting checks into bank ATM deposit

24  envelopes, covering up with excessive clothing prior to making an ATM transaction, and

25  - as of mid-March 2003 - to be in possession of two California Drivers Licenses in the

26  names of others but having his picture on them.

27       62.    CI-2 has met FARD on several occasions. CI-2 said that FARD, is

28  ASSALAAM's brother who she knows as "Abdul Taweed". According to CI-2, FARD is

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1 married to Sarah. CI-2 has discussed with Sarah how FARD and ASSALAAM make

2 money and CI-2 believes that Sarah is aware of the bank fraud scheme but dismisses it as

3 the "Will of Allah."

4       63.    On March 12, 2003, CI-2 was shown a December 9, 2002 FBI surveillance

5 photograph of the passenger who was in the black Mercedes Benz, WA 313-MOH, and

6 had used the BoA ATM located at 9916 17th Avenue SW. CI-2 believed the individual

7 pictured was ASSALAAM, and noted that he had a hat like the one on the individual in

8 the picture.

9 **M.    Information Provided by Kerima Abdurazak Yacub**

10       64.    On May 10, 2004, Kerima Abdurazak Yacub ("Yacub") was arrested by the

11 Phoenix Police Department ("PPD") for forgery in connection with her attempt on that

12 date to deposit a counterfeit cashier's check at a Cash 1 private check cashing business in

13 Phoenix, Arizona. Yacub was attempting to deposit a counterfeit Wells Fargo Bank

14 cashier's check payable to "CRYSTAL BROWN" in the amount of $2,500.00, numbered

15 0084504633, and dated May 6, 2004, using a counterfeit California Drivers License in the

16 name of Crystal Marie Brown. ASSALAAM, who was traveling with Yacub at the time,

17 was detained but released by PPD. Yacub was released on bail May 12, 2004 but failed

18 to appear for her arraignment hearing on June 16, 2004, causing a bench warrant to be

19 issued on that date for her arrest.

20       65.    On August 23, 2004, Yacub was located and arrested in Seattle. She has

21 since been extradited back to Arizona, where she is currently in jail awaiting trial on state

22 forgery charges. While in Seattle awaiting extradition, Yacub agreed to speak with FBI.

23 She was advised of her Miranda rights, signed an advice of rights waiver, and further

24 advised that, according to the United States Attorneys Office for the Western District of

25 Washington, she would not be prosecuted federally in connection with the bank fraud

26 scheme involving ASSALAAM so long as she was forthright and provided truthful

27 information regarding same. No additional promises were made to Yacub except that the

28

1   interviewing agent (and affiant) would make known the extent of her cooperation to the
2   prosecuting authorities in Arizona for their consideration as they deemed appropriate.

3       66.   According to Yacub, who is currently twenty years old, she first met
4   ASSALAAM when she was sixteen, and at that time believed him to be involved in a
5   bank card fraud scheme. Yacub later reacquainted with ASSALAAM and considered
6   herself his girlfriend for approximately one year, until her arrest May 10, 2004. She last
7   saw/spoke with ASSALAAM sometime late July 2004. Her active involvement in
8   ASSALAAM's bank fraud scheme began when she traveled with him to Los Angeles,
9   California early in May 2004. In Los Angeles they met with some people who took her
10   picture for a counterfeit State of California Drivers License for her in the name of Crystal
11   Marie Brown. After receiving the counterfeit drivers license, Yacub and ASSALAAM
12   flew to Phoenix where, until her arrest May 10, 2004, she used it to cash several
13   counterfeit cashier's checks for ASSALAAM. While they were in Phoenix,
14   ASSALAAM explained the bank fraud scheme to Yacub, saying he needed to make her
15   "hip to The Game." He justified it by saying that it goes "to help our Muslim brothers and
16   sisters" and that "it goes to the Cause, not like it goes to me and you." At a later date,
17   while attempting to convince Yacub to continue to help him in the bank fraud scheme,
18   ASSALAAM also explained "we need to get the money to get back at the Kafirs." Yacub
19   believes that ASSALAAM raises more money from the bank fraud scheme than he
20   actually spends.

21       67.   According to Yacub, soon after her release on bail and return to Seattle, she
22   advised ASSALAAM that she intended to return to Arizona to address her legal
23   problems. ASSALAAM responded that he would "shoot" Yacub and her family if she
24   said anything to the authorities. He said that his associates in California would see to it,
25   and that if they didn't then he would.

26       68.   Approximately two weeks after her return from Phoenix, Yacub went with
27   ASSALAAM to his associate's apartment in Kent to have her picture taken for another
28   counterfeit identification document. Accompanying them were ASSALAAM's brothers

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  FARD, who drove, and BROWN.  During the drive to the apartment ASSALAAM,
2  FARD and BROWN discussed the bank fraud scheme.  Also, Yacub saw that FARD had
3  a black, semi-automatic handgun on him that was tucked into his pants.  Yacub described
4  this apartment to be a third floor apartment in the Jonathan's Landing apartment complex
5  in Kent, and at a location consistent with apartment KK-303.  While in the apartment to
6  have her picture taken, Yacub observed three handguns in the apartment in addition to the
7  handgun on FARD:  a large-handled, semi-automatic handgun tucked into the waistband
8  of ASSALAAM's associate who appeared to reside there; a small silver-colored handgun
9  visible atop a desk by a computer; and black, semi-automatic handgun visible in an
10  opened desk drawer.  While in the apartment, Yacub observed a photography studio for
11  making counterfeit identification, including various color screen backdrops.  She also saw
12  passports and a web cam.  Although she had her picture taken at this apartment, she never
13  saw the resulting counterfeit identification document, and has not been involved in
14  ASSALAAM's bank fraud scheme since then.

15        69.     On September 8, 2004, Yacub was shown an unidentified copy of the
16  picture from Washington Drivers License number SANFOHC301CM, issued 04/19/2002
17  to Herbert Chandler SANFORD, born February 14, 1970, of 23240 88th Avenue S. (the
18  Jonathan's Landing apartment complex), Apartment KK-303 in Kent.  Yacub identified
19  SANFORD as ASSALAAM's associate discussed above, whose apartment she visited in
20  Kent and who took her picture for the creation of a counterfeit identification document.

21  **N.     Information Provided by Iome Marie Shad**

22        70.     Also in mid September 2004, FBI identified Iome Marie Shad as the
23  complainant to SPD regarding threats made by ASSALAAM, Karima, and an
24  unidentified male believed to be FARD, on September 1, 2004.  According to Shad, she
25  was an acquaintance of the female known as Karima several years ago, and also knew
26  ASSALAAM.  After an angry exchange of telephone calls in the early evening of
27  September 1, 2004 between Shad and her boyfriend with Karima, ASSALAAM called
28  back, was angry, and told Shad that he and some friends were coming over and that

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  "Everyone better be strapped up!"  Shad interpreted "strapped up" to mean getting guns.
2  Soon thereafter, a black, four door, Lexus sedan, believed to be FARD's WA 654-HZS,
3  drove by Shad's residence, soon after which ASSALAAM called and advised that he had
4  arrived.  ASSALAAM, Karima, and an unidentified male believed to be FARD, were
5  then observed exiting the Lexus and walking toward Shad's residence.  The unidentified
6  male believed to be FARD had his hand on his waistband, stopped, and positioned
7  himself behind a bush approximately seventy-five feet from Shad's residence.  After then
8  taking shelter inside the residence, Shad and her boyfriend noticed the Lexus was gone.

9      71.    In an interview by FBI on September 14, 2004, Shad advised that she met
10  Karima when both were children, and knows Karima to be ASSALAAM's current Islamic
11  wife and that they have been together for approximately one to two years.  Shad could not
12  recall Karima's given name, and knows her now only by her taken name of "Karima
13  Assalaam".  She and Karima did not go to school together and were not close friends, but
14  were friendly acquaintances who initially met at a roller rink.  Although uncertain, Shad
15  estimates Karima to currently be sixteen years old.  However, Shad is also aware that
16  Karima possessed at least four false identification cards or drivers licenses from
17  California and Washington which identify Karima to be between twenty-one and twenty-
18  four years old.  Shad was shown an unidentified picture of the woman who appears on the
19  counterfeit Washington Drivers License in the name of Nakiata R. Banks obtained by FBI
20  on July 30, 2004, and positively identified the individual pictured as Karima.  The
21  counterfeit Washington Drivers License identifies the individual to be twenty-one years
22  old.

23      72.    Shad further advised that in approximately May 2004, Karima and
24  ASSALAAM attempted to recruit her to participate in their ongoing bank fraud scheme.
25  They explained that they travel all over to cash counterfeit checks and that she would
26  keep 15%-25% of the profits.  ASSALAAM noted that she could not have a boyfriend
27  because she would be traveling extensively and staying in hotel rooms with him.  Karima
28

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  added this would be okay, even though she was his Islamic wife, as Muslim men could
2  have three or four wives at a time.

3      73.   One day during this time period, Karima and ASSALAAM invited Shad to
4  accompany them on a trip. They picked her up and drove to Jonathan's Landing
5  apartment complex in Kent, where Shad and Karima stayed in the car while ASSALAAM
6  got out and approached a third floor apartment. There he met with three unknown
7  African- American men on the landing outside the front door of the apartment. Shad
8  described one of the men as being bald headed. SANFORD's Washington State Driver's
9  License photograph depicts a bald headed individual. ASSALAAM returned to the car
10 with a photocopy of a Washington State Drivers License for an unknown female with a
11 Tacoma, Washington address, with additional identifying information for the individual
12 also handwritten on the photocopy. After departing the apartment in Kent, ASSALAAM
13 and Karima drove Shad to an apartment in Spokane, Washington, where ASSALAAM
14 picked up a check from an unknown individual that was made payable to the name on the
15 photocopied drivers license obtained at the apartment in Kent. ASSALAAM and Karima
16 explained that if Shad agreed to participate in the bank fraud scheme, they would take her
17 to California and provide her with some form of identification that would include her
18 photograph with the identifying information for the Tacoma female obtained at the
19 apartment in Kent. Upon returning to Seattle, ASSALAAM asked Shad to advise him
20 within a week if she was ready to participate in the bank fraud scheme. After discussing
21 it with her boyfriend, Shad decided not to participate.

22     74.   On September 23, 2004, Shad indicated she would be able to locate the
23 apartment complex and apartment in Kent where she traveled to with ASSALAAM and
24 Karima. Shad then directed FBI agents to the Jonathan's Landing apartment complex in
25 Kent and to apartment KK-303, which she positively identified as the apartment
26 ASSALAAM approached during her visit here with him and Karima.

27
28

**O.     Information Provided by Confidential Informant 3**

75.     On September 24, 2004, a reliable individual whose information has been consistently corroborated and who is a Muslim and FBI Confidential Informant ("CI-3"), began providing information on BROWN. CI-3 has resided in the Seattle, Washington area for over ten years and has been arrested several times, on misdemeanor charges, but has never been convicted. CI-3 is a small businessman who has expressed his appreciation for the freedom and opportunity he has experienced in the United States. CI-3 has been compensated for lost business in the amount of $500.00 to $1,000.00 per month. CI-3 has also been provided $1,500.00 per month to pay for rent and utilities of an office he set-up for the benefit of FBI investigations. CI-3 had recently acquainted with BROWN, who told CI-3 that he and his brothers are involved in a bank fraud scheme. BROWN explained how they acquire actual commercial bank account numbers from employer payroll checks, then - using a computer - produce counterfeit checks with the real bank account number on them. His brothers then recruit individuals to make available their personal bank cards, and to later report them to their bank as stolen. In the interim period, these bank cards are used to deposit the counterfeit checks into the corresponding bank accounts, and to make retail purchases and cash withdrawals against the fraudulent account balance. BROWN also explained that they need to accumulate $10,000.00 in order to get into a different illegal scheme.

76.     On November 3, 2004, CI-3 met with BROWN, who repeated information about the bank fraud scheme in which he and his brothers were involved. BROWN also explained how real cashier's checks are washed so that counterfeit checks can be reprinted on the paper. When CI-3 asked if it would be better to obtain blank official bank check paper, BROWN replied that it would be much better. CI-3 then offered to contact a friend who works in a bank about being a source of such paper. BROWN said he would pay CI-3 $100.00 to $150.00 per sheet for such paper and encouraged CI-3 to get a sample so he could show it to "his people". BROWN noted that two to four

1   counterfeit cashier's checks could be made from a sheet of blank official bank check
2   paper.

3       77.    On November 5, 2004, equipped with a recording device, CI-3 met with
4   BROWN. During this meeting, CI-3 provided an FBI-supplied Wells Fargo Bank sheet
5   of blank official bank check paper to BROWN, who indicated it was exactly what was
6   needed for the bank fraud scheme in which he and his brothers were involved. BROWN
7   said that he would pay CI-3 $100.00 for the sheet next week, and $100.00 for any
8   additional sheets that CI-3 could obtain. BROWN explained that his brother had passed
9   eight counterfeit cashier's checks in Phoenix for $2,500.00 each, but he paid $400.00 a
10   sheet for the paper used to make those checks and that source of paper is no longer
11   available.

12       78.    On November 9, 2004, equipped with a recording device, CI-3 met with
13   BROWN. During this meeting, BROWN told CI-3 that he wanted to get CI-3 involved in
14   "The Game", which is what BROWN calls the bank fraud scheme in which he and his
15   brothers were involved. BROWN asked CI-3 to get 20 more sheets of blank official bank
16   check paper from his/her bank friend, for which he would pay $1,000.00. BROWN also
17   asked CI-3 to help locate a "clean white female" to travel and pass counterfeit checks, for
18   which she would be paid $200.00 per check. Additionally, BROWN asked CI-3 to invest
19   $3,00.00 in "The Game", for which he would receive $5,000.00 at the end of a trip during
20   which the counterfeit checks would be cashed. Seed money was needed to fund the
21   expenses of a trip, which include travel and purchase of counterfeit identification
22   documents. They are planning a trip to California to obtain counterfeit identification
23   documents, then on to Albuquerque, New Mexico, where "The Game" has not been
24   played before.

25   **P.    ASSALAAM's Possession of Firearms**

26       79.    As explained above, CI-1 engaged in a recorded conversation with
27   ASSALAAM on August 2, 2002, during which CI-1 provided ASSALAAM with an FBI-
28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1 │ supplied Bank of America bank card ("Card 2"). During this same meeting, CI-1 and
2 │ ASSALAAM discussed guns, including the following exchange:

3 │       CI-1:          "I need one of them guys you been talking about."

4 │       ASSALAAM:   "They just raided my house and took both my straps."

5 │       CI-1:          "This weekend?"

6 │       ASSALAAM:   "No, not this weekend, a little while back . . . but I

7 │                     wasn't there though. So they ran into my house and

8 │                     took both my joints, so really that's a blessing. But I

9 │                     can get them joints back so, Inshallah to Allah, I get

10 │                     them back then I have three of them joints. If that

11 │                     happens I can sell you one."

12 │ CI-1 advised that he understood ASSALAAM to be talking about guns when using the
13 │ terms "straps" and "joints." Later during that same conversation, the following exchange
14 │ took place between ASSALAAM and CI-1:

15 │       ASSALAAM:   "I just want to die as a Shaheed."

16 │       CI-1:          "What's a Shaheed?"

17 │       ASSALAAM:   "A Shaheed is one who dies in the cause of Allah."

18 │     80.    Following this recorded conversation between CI-1 and ASSALAAM on
19 │ August 2, 2002, FBI learned that on July 6, 2002, and pursuant to a search warrant, SPD
20 │ seized two (2) 9mm handguns from the residence of ASSALAAM, including one found in
21 │ the bedroom of ASSALAAM. This residence was located at 5200 23rd Avenue SW,
22 │ Seattle, Washington 98106, which at that time was the residence for ASSALAAM, FARD,
23 │ and BROWN. Both of the firearms, and other evidence seized from ASSALAAM's
24 │ residence on July 6, 2002, remain in evidence with SPD. No charges are pending at the
25 │ state level against ASSALAAM relating to this incident.

26 │     81.    On November 12, 2004, the two 9mm handguns and ammunition seized by
27 │ SPD from the then residence of ASSALAAM at 5200 23rd Avenue SW in Seattle on July
28 │ 6, 2002, were examined by ATF Agent Brian Downey. Agent Downey described each

1  firearm as an Astra Model A-100 9mm semi-automatic pistol with serial numbers SA-

2  3759D and SA-3513D.  Agent Downey also determined that the guns operated as a

3  firearm, as defined in Title 18, United States Code, Section 921(a)(3).  Additionally, Agent

4  Downey determined that the handguns and the ammunition were not manufactured in

5  Washington and had therefore traveled in interstate commerce.

6       82.    I have also obtained certified copies of two prior felony convictions for

7  KARIM ABDULLAH ASSALAAM.  They reflect the following:

8           a.    Violation of Uniformed Controlled Substance Act - Possession of

9                  Cocaine in King County Superior Court, State of Washington, cause

10                  number 88-1-02882-2, on October 17, 1988; and

11           b.    Violation of Uniformed Controlled Substance Act - Possession of

12                  Cocaine in King County Superior Court, State of Washington, cause

13                  number 89-1-03486-3, on December 1, 1989.

14  **LOCATIONS TO BE SEARCHED**

15  **A.**    **ASSALAAM's Residence 25108 112ᵗʰ Avenue SE, Apartment 7, Kent, Washington**

16

17       83.    The local mail carrier for the residence of ASSALAAM and Karima, located

at 25108 112th Avenue SE, Apartment 7, Kent, Washington 98030 and further described

18

19  in Attachment A, advised on November 15, 2004, that both ASSALAAM and Karima

currently received mail at that address.  FBI surveillance was last conducted at this

20

21  residence on September 16, 2004, when ASSALAAM was observed departing from and

returning to this location.

22

23  **B.**    **FARD's Residence 3660 Bridgeport Way W. Apartment C-102, University Place, Washington**

24       84.    The local mail carrier for the residence of FARD, located at 3660 Bridgeport

25  Way W., Apartment C-102, University Place, Washington 98466 and further described in

26  Attachment B, advised on November 15, 2004, that FARD currently received mail at that

27  address.  FBI surveillance was conducted at this residence on September 16, 2004, when

28

1  FARD was observed in WA 654-HZS parked at this location. On November 15, 2004,

2  FBI surveillance observed FARD's vehicle, WA 654-HZS, parked at this location.

3  **C.   SANFORD's Residence - 23240 88ᵗʰ Avenue S. Apartment KK-303, Kent Washington**

5       85.     The local mail carrier for the residence of SANFORD, located at 23240 88th

Avenue S., Apartment KK-303, Kent 98031 and further described in Attachment C,

advised on September 21, 2004 that SANFORD was confirmed as an authorized recipient

of mail at that address. On November 3, 2004, abandoned property was recovered in the

trash from this residence, including receipts for three prescriptions dated "10/28/2004" for

"Herb SANFORD." FBI surveillance was last conducted at this residence on November

10, 2004, when an individual matching the appearance of SANFORD was observed

departing from this location.

## SEARCH AND SEIZURE OF COMPUTERS

13       86.     Among the items for which search warrants are sought is computer

equipment used by ASSALAAM and his associates in their counterfeit check fraud

scheme. Based upon my training, experience, and consultations with others, I know that

conducting a search of computer equipment, documenting the search, and making

evidentiary and discovery copies is a lengthy process. I also know that in order to

completely and accurately retrieve information maintained in computer equipment, and to

prevent the loss of such information either from accidental or programmed destruction, it

commonly requires agents to seize most or all electronic storage devices (along with

related peripheral equipment) to be searched later by a qualified computer specialist in a

laboratory or other controlled environment. This requirement is due to the following:

23       a.     The volume of evidence. Computer storage devices (such as hard

disks, diskettes, tapes, laser disks, Zip disks) can store the equivalent of thousands of

pages of information. Additionally, a suspect may try to conceal criminal evidence by

storing it in random order with deceptive file names. Searching authorities are thus

required to examine all the stored data to determine which particular files are evidence or

instrumentalities of criminal activity. This analysis can take weeks or months, depending

1   on the volume of data stored, and it would be impractical to attempt this kind of data

2   analysis on-site.

3           b.   <u>Technical requirements</u>.  Analyzing computer systems for criminal

4   evidence is a highly technical process requiring expert skill and a properly controlled

5   environment.  The vast array of available computer hardware and software requires even

6   computer experts to specialize in some systems and applications, so it is difficult to know

7   prior to the search which expert possesses the skills to best analyze the system and its data.

8   In any event, computer analysis protocols are exacting scientific procedures, designed to

9   protect the integrity of the evidence and to recover even hidden, erased, compressed,

10  password protected, or encrypted files.  Since computer evidence is extremely vulnerable

11  to tampering or destruction (both from external sources or from destructive code imbedded

12  in the system as a "booby trap"), a controlled environment is essential to its complete and

13  accurate analysis.

14          c.   Authorization is sought in this application to seize any computers,

15  input/output devices, software, documentation, and data security devices that are found on

16  the premises to be searched, both as instrumentalities and in order to examine those items

17  for evidence.  If it is determined that data has been seized that does not constitute evidence

18  of the crimes detailed herein, the government will return said data within a reasonable

19  time.

20      87.   The search protocol that will be used for the electronic data contained in the

21  computer operating software or memory devices, whether performed on site or in a

22  laboratory or other controlled environment, may include the following techniques:

23          a.   Surveying various file directories and the individual files they contain

24  (analogous to looking at the outside of a file cabinet for the marking it contains and

25  opening a drawer believed to contain pertinent files);

26          b.   Opening or cursorily reaching the first few pages of such files in

27  order to determine precise contents;

28

1    c.  Scanning storage areas to discover and possibly recover recently
2 deleted data;

3    d.  Scanning storage areas for deliberately hidden files;

4    e.  Performing key word searches through all electronic storage areas to
5 determine whether occurrences of language contained in such storage areas exist that are
6 related to the subject matter of the investigation;

7    f.  Electronically creating a mirror image (exact copy) of the computer
8 operating software or memory devices to minimize the risk that the original electronic
9 information will be altered and to improve the ability to search the data for relevant
10 information.

11  Appropriate efforts shall be made to minimize the disclosure of records and other
12 information which is not the subject of this warrant.

13        **CONCLUSION**

14  88.  Based upon the foregoing, I believe probable cause exists that ASSALAAM,
15 FARD, BROWN, and SANFORD each have violated Title 18, United States Code,
16 Section 1344 (Bank Fraud) and Title 18, United States Code, Section 371 (Conspiracy to
17 Commit Offense of Bank Fraud). Further, I believe probable cause exists that
18 ASSALAAM has also violated Title 18, United States Code, Section §922(g)(1) (Felon in
19 Possession of Firearm). Accordingly, I request that arrest warrants be issued for
20 ASSALAAM, FARD, BROWN, and SANFORD.

21  89.  Also based upon the foregoing, I believe probable cause exists that FARD's
22 automobile, a black, four door, 1994 Lexus LS-400, VIN JT8UF11E5R0192544,
23 Washington tag 654-HZS was purchased with proceeds from bank fraud in violation of
24 Title 18, United States Code, Sections 982(a)(2)(A) and 982(b)(1) and Title 28, United
25 States Code, Section 853(f) (Forfeiture). I also believe that a restraining order would not
26 be sufficient to assure the availability of the property for forfeiture due to its mobility and
27 ease of liquidation. Accordingly, I request that a seizure warrant be issued for FARD's
28 automobile.

1       90.    Based upon my training, experience, participation in fraud investigations,

2 and what I have learned from other investigators, I know that it is common for individuals

3 engaged in fraud to conceal evidence of their crimes, including the items described in

4 Attachment D of this Affidavit, in their personal residences for long periods of time.

5 Further it is common that individuals engaged in fraud will maintain such items in their

6 vehicles. I also know that it is common for individuals engaged in fraud to maintain

7 electronically on computers or computer disks at their residence the records used to

8 perpetrate the fraud.

9       91.    Based upon the foregoing, I also believe probable cause exists that property -

10 more particularly described in Attachment D of this Affidavit, which constitutes

11 contraband, as well as fruits, evidence and instrumentalities of violations of Title 18,

12 United States Code, Section 1344 (Bank Fraud), Title 18, United States Code, Section 371

13 (Conspiracy), Title 18, United States Code, Section 922(g)(1) (Felon in possession of a

14 firearm), and Title 18, United States Code, Section 1028 (Fraud and Related Activity in

15 Connection with Identification Documents) - may now be contained in the residence of

16 ASSALAAM, the residence of FARD, the residence of SANFORD, and FARD's vehicle.

17 Accordingly, I request that search warrants be issued for the residence of ASSALAAM,

18 the residence of FARD, the residence of SANFORD, and FARD's vehicle, authorizing the

19 seizure of the items listed in Attachment D of this Affidavit and the analysis of any

20 computer equipment and electronic storage devices so seized.

21

22                                     _FREDERICK C. GUTT_, Complainant

23                                       Special Agent, FBI

24       Complaint and affidavit sworn to before me and subscribed in my

25 presence, November ___, 2004.

26

27                                       MONICA J. BENTON

28                                       United States Magistrate Judge

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970