ORIGINAL

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>HERBERT CHADLER SANFORD,<br>Defendant. | No. CR 04-521C<br>04-643M |

VERBATIM TRANSCRIPT OF PROCEEDINGS

OF

A HEARING

BEFORE THE HONORABLE MONICA J. BENTON, MAGISTRATE JUDGE

December 14, 2004

APPEARANCES

For Plaintiff United States: Carl Blackstone

For Defendant Sanford: Catherine Chaney

Also Present: Sara Moore, USPTS

04-CR-00521-TN

Transcribed from CD recording using word processing equipment

Transcribed by Brian Killgore

ACE Reporting Services, Inc. (206) 467-6188

1         (Proceedings of 12/14/2004)
2     THE CLERK: All rise, the United States District Court for
3 the Western District of Washington is now in session, the
4 Honorable Monica J. Benton presiding.
5     THE COURT: Good morning, please be seated.
6     THE CLERK: Your Honor, the case that's here before you is
7 here for a detention review hearing in Cause Number CR 04-521C,
8 United States v. Herbert C. Sanford. Will counsel please make
9 appearances for the record?
10    MR. BLACKSTONE: Good morning, your Honor, Carl Blackstone
11 for the United States. With me is FBI Agent Fred Good
12 (phonetic).
13    THE COURT: Thank you, good morning.
14    MS. CHANEY: Good morning, your Honor, Catherine Chaney on
15 behalf of Mr. Sanford. He is present.
16    THE COURT: Ms. Chaney, Mr. Sanford, good morning.
17  Let me first inquire of the government's position on the
18 question of reopening this hearing and specifically the
19 recommendation of the defense.
20    MR. BLACKSTONE: Your Honor, we think it's appropriate to
21 reopen the hearing. Ms. Chaney has presented some new evidence
22 to the Court, but we don't think it warrants changing the
23 Court's detention order. We think the defendant should still be
24 detained and I'll address the argument when it's appropriate.
25    THE COURT: All right. Thank you.

**ACE Reporting Services, Inc. (206) 467-6188**

1   All right, with that, then, Ms. Chaney, do you wish to make
2   argument in support of your motion?
3   MS. CHANEY: Yes, your Honor, thank you.
4   THE COURT: Uh-huh.
5   MS. CHANEY: Your Honor, present today in court are various
6   members of Mr. Sanford's family, and also friends. Cheryl
7   Wright, his wife, is present. His friend Valerie Najaro and
8   actually Cheryl's sister. A friend Derek Goodrich. A friend
9   Jamilia Adams, and that also the Wesleys, Candice and Preston
10  Wesley, and their -- the couple who are offering Mr. Sanford a
11  place to live in their home if he is released on conditions.
12  THE COURT: Where are the Wesleys? Very well.
13  MS. CHANEY: Your Honor, I did have an opportunity to
14  review the new information in the Pretrial Services' report, and
15  go over the proposed release conditions with Mr. Sanford this
16  morning. He has no objection to any of those release
17  conditions.
18  THE COURT: All right.
19  MS. CHANEY: So we would ask the Court to release him on
20  those conditions. I think the presumption is certainly for
21  release, not for detention. He does have criminal history;
22  however, I would point out that none of that suggests that he's
23  ever been a risk in the past, or that he's failed to appear for
24  court in the past.
25  He has strong family ties here. His three children are here.

1  The mother of two of his children couldn't be here this morning,
2  Deborah Robinson, but she did write a letter to your Honor,
3  indicating that Mr. Sanford has been much more involved in the
4  lives of his children recently, and many of his other ties to
5  the community and his efforts to create a new life for himself
6  are verified in the other letters presented to the Court.
7       THE COURT: Let me ask you a question.
8       MS. CHANEY: Sure.
9       THE COURT: The residence address is a Tacoma address; is
10 that correct?
11      MS. CHANEY: Yes, your Honor.
12      THE COURT: And his work is in Seattle or Fife? Where is
13 it?
14      MS. CHANEY: No, ``Michael Floyd'' is I believe in Fife.
15      DEFENDANT SANFORD: No, Lakewood. Tacoma.
16      MS. CHANEY: Oh, Lynnwood.
17      DEFENDANT SANFORD: Tacoma.
18      MS. CHANEY: Tacoma.
19      THE COURT: All right, let's see what's verified. You have
20 filed documents with the Court, Ms. Chaney; do you list the
21 address at all?
22      MS. CHANEY: Uhm --
23      THE COURT: Is he to return to work with --
24      MS. CHANEY: Your Honor --
25      THE COURT: -- ※ Cut 'n up※ ?

1      MS. CHANEY:  Your Honor, I have that address.

2      THE COURT:  What is it?

3      MS. CHANEY:  In Lakewood.  9808 59th Ave SW, Lakewood,
4 Washington.

5      THE COURT:  All right, and that is the name of which?

6      MS. CHANEY:  "A Cut Above."

7      THE COURT:  "A Cut Above?"  And that's different from ``Cut
8 `N Up''?

9      MS. CHANEY:  Correct.

10     THE COURT:  All right.

11     MS. MOORE:  He had worked, your Honor -- to clarify, he had
12 worked at "A Cut Above" in the past, but more recently he had
13 worked at ``Cut `N Up.''  However, since it would be closer to
14 where he'll be living, if released with the Wesleys, he would
15 prefer to work at Mr. Floyd's shop.

16     THE COURT:  All right, it is listed on page 3 of your
17 report.  All right.

18     MS. CHANEY:  And, your Honor, the other thing that I would
19 point out based on the current charges in the indictment and the
20 complaint, even given his criminal history, given the loss
21 amounts, which the government has currently alleged, he would
22 only be looking at approximately a year if he were convicted.

23     So the length of the potential sentence I think isn't so
24 great that he would risk everything that he would lose if he
25 were to attempt to evade this court or flee.  He certainly does

*ACE Reporting Services, Inc. (206) 467-6188*

1  not intend to do so, and so we would ask the Court to release
2  him on all of the conditions.
3      THE COURT: All right. The type of work that he would be
4  doing would put him in contact with other people's debit cards,
5  cash cards, that sort of thing; the family is shaking their head
6  no, but how does -- how is money handled at this barbershop?
7      MR. WESLEY: It's all cash.
8      THE COURT: Thank you, Mr. Wesley. I need something
9  verified.
10   Do you know, Ms. Moore?
11     MS. MOORE: No, your Honor, I do not know.
12     THE COURT: All right. Ms. Chaney?
13     MS. CHANEY: I don't know, your Honor.
14     THE COURT: I'm just trying to make sure I ask --
15     MS. CHANEY: I mean if the Court --
16     THE COURT: -- the right questions.
17     MS. CHANEY: -- wanted to put a condition on it --
18     THE COURT: I think I would.
19     MS. CHANEY: -- that any -- other than cash, any payment
20  would have to go through the owner or through another person at
21  the shop, and that he would only be allowed to deal in cash. We
22  would have no objection to that.
23     THE COURT: All right.
24     MR. WESLEY: I was employed as a barber there myself, so I
25  know how they receive money.

1   MS. CHANEY: Mr. Wesley -- to his knowledge, they're not --
2 they can't take debit cards, but we don't have any objection to
3 that if the Court wants it added.
4   THE COURT: All right, anything further?
5   MS. CHANEY: No, your Honor, thank you.
6   THE COURT: All right, thank you.
7 Mr. Blackstone?
8   MR. BLACKSTONE: Thank you, your Honor. The Court entered
9 a detention order recently in which you found the defendant was
10 not a good candidate for release because of his lack of a stable
11 residence, his unverified background, his use of aliases,
12 different social security numbers, and his extensive criminal
13 history.
14 We don't believe this new information provided by the defense
15 overcomes the Court's prior findings.
16   THE COURT: Um-hum.
17   MR. BLACKSTONE: First she's submitted two new pieces of
18 information for you: One is the Wesleys will take in the
19 defendant now.
20   THE COURT: Um-hum.
21   MR. BLACKSTONE: And my only question there is how come
22 he's not living with his wife? I don't understand that. Where
23 is his wife living and how come he's not residing with his wife?
24 Why is he going to live with the Wesleys? I don't know the
25 answer to that.

1  As to his employment, he has not worked for Mr. Floyd for
2  some time, so this is not a new and stable place of employment.
3  It's a new place of employment. I'm not confident what he's
4  going to be doing there. He's going to be working on a
5  commission basis.
6  But even if the Court finds that information is satisfactory,
7  I think there's a lot of problems in releasing this defendant.
8  First as to flight risk, we think he is a risk of flight.
9  And one thing I know the Court looks at is whether they can
10 trust the defendant when they release him, because a lot of the
11 system is based on trust: When he gives you his word he'll show
12 up; can you believe him?
13 We already know he's lied to this court and to Pretrial
14 Services. When he was first interviewed he told Pretrial that
15 he was living at a residence in Kent with a woman named Tracy
16 Spencer. We all know that's not true.
17 Tracy Spencer has been interviewed and she said that he was
18 not living with her -- he was not living with her at the time of
19 his arrest in November.
20 The FBI has talked to Ms. Spencer and she said that he would
21 spend a couple of days a week there at her apartment, on and off
22 for the last year, but when he was interviewed by Ms. Moore, and
23 she prepared a report, he said he was living with Tracy Spencer.
24 That's not true.
25 We don't know where he's been living for the last couple of

weeks before he got arrested. We don't know anything about Ms. Wesley.

So I think the Court should look at his truthfulness; if he's lying to the Court about where he lived, there's something going on there.

When he was arrested on November 18, he tried to flee from the FBI agent. He tried to discard his keys to his Cadillac and a couple of cell phones. And he did that for good reason, because inside his Cadillac the FBI found a lot of incriminating information. They found identification documents for about 50 people. These are real live people. He had their driver's license photograph -- he had credit applications for them, banking information for them, and insurance information for them.

All the things you need to make a false ID to assume someone else's identification.

He also had a laptop computer in his car -- the tools of the trade. Something that could be used to make a fake ID. And on that laptop the FBI did find some evidence that he was making false identifications -- not for him, but possibly for other people.

Additionally, he had a check in his possession when he was arrested; it came back to Ms. Spencer's payroll checks. She worked for a company called Nurse Link, and he had a copy of her check in his possession with the payee name blacked out. That

1  check was used in this bank fraud scheme by another defendant.
2  THE COURT: Who is Ms. Spencer?
3  MR. BLACKSTONE: Ms. Spencer was his girlfriend, the woman
4  he was living with in Kent, right prior to his arrest.
5  THE COURT: All right.
6  MR. BLACKSTONE: So we think that the fact that he fled at
7  the time of his arrest, the fact that he has the ability to make
8  false IDs -- the Court has already found he's used different
9  names in the past and different Social Security numbers. He's
10 got all the tools of the trade to enable him to flee.
11 And contrary to what Ms. Chaney says, he is looking at a lot
12 more time in federal prison. Right now we're working on the
13 loss figure, but the FBI can prove at least $300,000 from this
14 scheme, and I anticipate it's going to go as high as $500,000.
15 If it's at half a million dollars, he's looking at eight to
16 10 years in federal prison, given his criminal history, so it's
17 not one year or two years, like Ms. Chaney said. He's looking
18 at more time than he's ever faced before in federal prison. And
19 as the Court knows, we don't have parole anymore, so when you
20 get a 10-year sentence, you serve essentially all of that.
21 So the complexion of this case has changed and the incentive
22 to flee I think goes way up given that -- the amount of time
23 he's looking at.
24 Additionally, we're concerned also with the issue of danger.
25 His criminal history is uninterrupted from 1987 to the present.

1  That's 17 years. He's suffered conviction after conviction,
2  culminating in a 1998 conviction for drugs, in which he was
3  sentenced to 67 months in prison. He has a forgery conviction,
4  a credit card fraud conviction, all the same things he's accused
5  of doing now, so I think this criminal history militates in
6  favor of a danger to the community.
7  Additionally, in our complaint that was signed by this court,
8  a witness said that she had been to Mr. Sanford's apartment back
9  in May or June of this year, and while there, he was taking her
10 photograph for use in a fake ID. She saw three handguns in his
11 residence.
12 Those guns are still unaccounted for, so we're concerned
13 about those guns that are sitting out there.
14     THE COURT: They're found in his home?
15     MR. BLACKSTONE: In the apartment he was sharing with Ms.
16 Spencer.
17     THE COURT: All right.
18     MR. BLACKSTONE: And Ms. Spencer has said she never saw
19 guns in her apartment. That's what she has told the FBI. But
20 the witness who was interviewed by the FBI said she saw three
21 guns there, and she was down there with Mr. Sanford taking her
22 picture for use -- to make a fake ID with.
23     I think that's all I have, thank you.
24     THE COURT: All right.
25 You trigger my recollection of the first hearing with your

1  recitation of the case and the case investigation.
2     Any response, Ms. Chaney?
3     MS. CHANEY: Yes, your Honor.
4  Regarding the allegation of the use of different names and
5  Social Security numbers, I believe that that information came
6  from the NCIC, which is not necessarily verified, and I don't
7  know what that's based on, but there's certainly nothing --
8  there are no facts in the complaint to suggest that that is
9  true, and sometimes information on those NCICs can be extremely
10 unreliable, in my experience, anyway.
11    Mr. Blackstone suggested that he didn't know who Mrs. Wesley
12 is; Mrs. Wesley is a very long-term friend and ex-girlfriend of
13 Mr. Sanford, and the mother of his oldest son. She is a fixture
14 in this community, as is her husband, and they've offered a
15 stable residence for Mr. Sanford to stay in. They trust him and
16 love him and they don't have any problem with him staying at
17 their house.
18    You know, in terms of the loss amount, I don't know; all I
19 know is that the information -- the only information that the
20 government has given me suggests a much, much lower number, and
21 so we'll see whether or not in fact it's the case that there is
22 actually a higher number.
23    In terms of the complaining witness mentioned by Mr.
24 Blackstone, I think it's interesting that he also indicated that
25 Ms. Spencer, who was living in that apartment, said that she

1  never saw Mr. Sanford with a gun, or never saw any guns in that
2  apartment.
3      That witness is a cooperating witness and I believe that the
4  Court should view her information with caution, just as a jury
5  would be instructed at trial to view any information from a
6  cooperating witness who is benefiting by giving testimony to the
7  government, with extreme caution.
8      There is no other information that Mr. Sanford has ever been
9  in possession of a firearm, and indeed he's well aware that as a
10 felon he can't have a firearm or be anywhere near firearms.
11     The Wesleys would have -- certainly wouldn't take him in if
12 they thought that he was attempting to use a weapon or have
13 access to a weapon.
14     Your Honor, there certainly are conditions -- and again, his
15 criminal history -- you know, we acknowledge he certainly does
16 have criminal history, but he's been making an effort to go
17 straight, and he doesn't have warrants on his criminal history,
18 which is significant.
19         THE COURT: Do you have an answer or explanation for his
20 failure to be candid with Pretrial Services about his residence
21 when he was interviewed?
22         MS. CHANEY: Your Honor, he had been living there off and
23 on, and he thought that he was still living there, is my
24 understanding.
25         THE COURT: All right. You know, my experience tells me

1  that the scenario that the Wesleys provide and the circumstances
2  which Ms. Spencer provides are not stable, because of the
3  pattern of this off and on residence business. I mean this is a
4  grown man who can conduct his business any way he wishes, as
5  long as somebody is willing to stand up and say he lives here.
6  And I'm really -- I think there's a pattern there. I really
7  think -- I mean his wife doesn't want him there, or you don't
8  think she's --
9      MS. CHANEY: It's not -- your Honor, they're separated.
10     THE COURT: -- stable.
11     MS. WRIGHT: That's not true at all.
12     THE COURT: Well don't respond out loud. Raise your hand
13 and wait till you're recognized. All right.
14   Go ahead, Ms. Chaney.
15     MS. CHANEY: Your Honor, they are separated, and that's
16 why -- and they don't have an intention to -- they are in the
17 process of divorce, I believe --
18     THE COURT: All right.
19     MS. CHANEY: -- and so that's what's going on with that,
20 but she certainly supports him and has -- you know, they are
21 good friends and they'll stay friends.
22     THE COURT: All right. All right. She wants to be
23 recognized by the Court, so have her come forward, please.
24   Mr. Blackstone, I have a question for you, after she finishes,
25 and it has to do with the specificity of the witness's

1   description of the firearms when she saw them.

2   MS. WRIGHT: Hello, my name is Cheryl Wright. In regards
3   to our separation, we have been separated for a little over a
4   year. The reason for our separation is because of Ms. Spencer.
5   It's because at the time he was, you know, cheating on -- having
6   an affair with me -- with Ms. Spencer. He was staying there. I
7   went there on several occasions, so whatever she is saying to
8   these officers is like totally untrue.

9   I know at the time when he was arrested, they had departed,
10  and he was staying just like with various friends, or just
11  staying around because he didn't have the money to get his own
12  place.

13  THE COURT: Um-hum.

14  MS. WRIGHT: But he -- he was, you know, staying with her
15  for the last year. I witnessed that because I went there -- you
16  know, because I found her address, and that's how I figured that
17  he was staying with her, and her residence is not far from mine.

18  THE COURT: Um-hum.

19  MS. WRIGHT: And so as far as, you know, what she's telling
20  the Court, I don't know why she would say that -- probably
21  because she's angry because of their separation, but they have
22  been seeing each other for like well over a year.

23  And as far as him not coming to my home, he's more than
24  welcome to come to my home, even though -- you know, I'm the one
25  that puts the past behind me, you know, so what he did in the

1  past, as far as Ms. Spencer, that's something that he has to
2  deal with, you know?
3     And if the Court wants him to come to my house, he's more
4  than welcome, but his son wanted him to stay with him, and
5  that's the reason why -- one reason why Ms. Wesley opened her
6  home to him.
7     THE COURT: All right. Thank you.
8     Ms. Wesley, you want to be recognized, as well? Step
9  forward.
10    Thank you, Ms. Chaney.
11    MS. WESLEY: Hello, my name is Candice Wesley, and in
12 regards to him saying he doesn't know anything about the
13 Wesleys, he's right, he doesn't know anything about the Wesleys.
14    Also in regards to Ms. Spencer, I've spoken with her since
15 all of this has been going on, on several occasions -- actually,
16 as recent as last night, and she has shared with me that she was
17 scared and that she was afraid, and my question to her is when
18 someone's life is on the line, why would you lie? Because in
19 between their disagreements and their arguing, my husband and I
20 have provided a safe haven for him, so that he didn't sleep in
21 the car, and so that he didn't have to bum money from other
22 people to have a place to lay his head, and so I do have some
23 concerns in regards to her credibility, as far as her telling
24 the truth, in regards to where he resided -- as far as I know,
25 he stayed there. She's been to my home on several occasions

*ACE Reporting Services, Inc. (206) 467-6188*

1  with him. She has also called my home when they weren't -- I
2  knew that they were not together when he was arrested because
3  she had called me to see if he was sleeping at my house, because
4  he always comes to be with his son.
5     And so that's how I knew that they were not getting along.
6        THE COURT: What you're telling me --
7        MS. WESLEY: So she shocked me when she told me that she
8  told them that he didn't live with her.
9        THE COURT: Well you just said they weren't together.
10       MS. WESLEY: Right, but they are making it seem like he
11 never was with her. I can see him not being with her for three
12 or four months and never living there; it's one thing when you
13 get in an argument, pack your stuff up and leave, but he lived
14 with her.
15       THE COURT: All right.
16       MS. WESLEY: And so I don't know why she's not telling the
17 truth. That's something they would have to take up with her.
18       THE COURT: All right.
19       MS. WESLEY: And that's what I have to say.
20       THE COURT: All right, thank you, Ms. Wesley.
21    Mr. Blackstone?
22       MR. BLACKSTONE: I think what I said, your Honor, was he's
23 lived there on and off for the past year, but at the time of the
24 arrest, they had broken up and he was no longer residing there,
25 so I don't mean to mislead the Court --

1      THE COURT: I think that's consistent with what Ms. Wesley
2  is saying. Go ahead.
3      MR. BLACKSTONE: One thing I wanted to share with the
4  Court, the agent just provided me with a series of business
5  cards that were taken from Mr. Sanford's Cadillac, and they all
6  have a fake name on it -- "Upper Cuts." A hair-cutting place
7  with the name of Rafeek Sadeek (phonetic). This is an alias
8  that the defendant has been known to use, so he's got business
9  cards with a name other than his own.
10     THE COURT: Um-hum.
11     MR. BLACKSTONE: I think it confirms what the NCIC pointed
12 out by way of aliases.
13   In terms of the guns, your Honor, I'm referring to paragraph
14 68 of the complaint, which this court signed I think on November
15 17. The witness's name is Kareema Yaku (phonetic), and in this
16 paragraph she says she went down to Mr. Sanford's apartment to
17 have her picture taken, and she reports that while in the
18 apartment to have her picture taken, she observed three handguns
19 in the apartment in addition to those that the other defendants
20 had. So that's the best I can do in terms of giving you a
21 description. They were handguns.
22     THE COURT: Is she a cooperating witness as Ms. Chaney has
23 characterized her?
24     MR. BLACKSTONE: She is, but she's -- she has cooperated
25 with the government. We've offered her nothing for her

1  cooperation. She is currently in custody in Phoenix. She was
2  arrested on trying to pass some counterfeit checks.
3      THE COURT: Um-hum.
4      MR. BLACKSTONE: So we've not given her immunity or told
5  her she won't be charged.
6      THE COURT: Um-hum.
7      MR. BLACKSTONE: She has cooperated with us and told us
8  what happened, but there have been no promises made to her in
9  exchange for her testimony.
10     THE COURT: All right.
11  You know, I think that my experience and instinct in this
12  case is right about Mr. Sanford.
13  I think the lack of stable residence, the lack of crime free
14  background, and/or even recent crime free background, the
15  presence of other people's identifications in his car, the
16  attempt to flee and discard his association with the car, the
17  keys, etc. -- I think that I'm right about detaining Mr.
18  Sanford, and I'm going to detain him.
19  So I would not remove the order. He'll continue to be in
20  custody. Very well, thank you.
21     MR. BLACKSTONE: Thank you, your Honor.
22     THE CLERK: All rise, the Court is in recess.
23          (End of Proceedings for 12/14/2004)
24
25

USA v. Herbert Chadler Sanford - CR 04-521C - (12/14/2004) - P. 20

C E R T I F I C A T E

I, Brian Killgore, do hereby certify:

That ACE Reporting Services, Inc., is a court-approved transcription company for the state of Washington, counties of King and Cowlitz, and for the United States District Court for the Western District of Washington;

That the annexed and foregoing transcript of electronically recorded proceedings was transcribed by me to the best of my ability;

I further certify that I am not a relative or employee or attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or outcome thereof;

I further certify that the transcript is a true and correct record of all audible portions of the taped testimony, including questions and answers, and all objections, motions and exceptions of counsel made at the time of the foregoing proceedings. Areas of the tape(s) or CD(s) that were not decipherable for any reason are noted as [INAUDIBLE].

Dated this 31st day of December 2004.

Brian J. Killgore
ACE Reporting Services, Inc.
1900 West Nickerson Street
Suite 209
Seattle, WA 98119-1650
(206) 467-6188

Notary Public in and for the
State of Washington,
Residing at Seattle.

My commission expires 11/1/2008



**ACE Reporting Services, Inc. (206) 467-6188**