```
 1                  UNITED STATES DISTRICT COURT

 2                WESTERN DISTRICT OF WASHINGTON

 3   THE UNITED STATES OF AMERICA, )
                                   ) No. CR 05-217 MJB
 4        Plaintiff,               )
                                   )
 5             vs.                 )
                                   )
 6   ATAWWAAB MUHAMMAD FARD,       )
                                   )
 7        Defendant.               )
     _____)

 8

 9            VERBATIM TRANSCRIPT OF PROCEEDINGS

10                           OF

11              AN EVIDENTIARY HEARING

12       BEFORE THE HONORABLE MARY ALICE THEILER

13                   July 26, 2005

14                     APPEARANCES

15   For Plaintiff United States: Carl Blackstone & Rich Cohen

16             For Defendant Fard: Lee Covell

17             Also Present: N/A

18

19

20

21   Transcribed from CD recording using word processing equipment

22

23

24

25             Transcribed by Brian Killgore
```

                                                          1

*ACE Reporting Services, Inc. (206) 467-6188*

1          (Proceedings of 7/26/2005)

2       THE CLERK:  . . . last time -- to call the case; this is

3   case number 04-521, <u>United States v. Attawwaab Fard</u>.  Why don't

4   we take appearances for the record -- for the United States?

5       MR. BLACKSTONE:  Good morning, your Honor, Carl Blackstone

6   and Rich Cohen for the United States.  With us is Fred Gutt, a

7   special agent with the FBI.

8       THE COURT:  Good morning.

9       MR. COVELL:  Good morning, your Honor, Lee Covell

10  representing Attawwaab Fard.

11      THE COURT:  All right.  This had been started on June 10 for

12  a hearing on the government's motion to forfeit a 1994 Lexus

13  automobile.  It was rescheduled to June 20, and then all court

14  proceedings for that afternoon were canceled, and then

15  rescheduled to -- I think it was the 10th of July, and we

16  discovered Mr. Fard had been transferred from the Federal

17  Detention Center, so we had to have him come back, and here we

18  are today.

19    I reviewed my notes to refresh my memory about where we were,

20  and let me review that and see if we are in agreement.

21    The government had presented the testimony of Agent Gutt and

22  Exhibits 1, 5, 7, 10, 12 and 13, and rested; then the defense

23  called Mr. Ali Brown, Ms. Iran Khaledi, and Mr. Attawwaab

24  Muhammad Fard, the defendant, to testify, and I think we were in

25  the middle of that testimony; is that right?  And in fact I think

2

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    we're still in the direct testimony?

2         MR. COVELL:  That is correct.

3         THE COURT:  Okay.  There were several exhibits offered and

4    admitted:  Those were A1, A2, A3, and A8.

5      We did discuss A7 but it was not offered -- or, let's see --

6    no, it was not admitted.  Those were the handwritten statements

7    by the brother.  In fact I think we were talking about Exhibits

8    A4, 5, and 6, but we didn't actually get to the point of

9    admitting those.

10     Now is there -- am I -- have I said anything that is not

11   correct, or is there anything I should add, Mr. Blackstone?

12        MR. BLACKSTONE:  Well I'm showing that Government's Exhibits

13   2, 3, 4, 8, and 9 --

14        THE COURT:  Oh --

15        MR. BLACKSTONE:  -- and 10 were also admitted.

16        THE COURT:  I'm sorry, it's 1 through 5.

17        MR. BLACKSTONE:  Right.

18        THE COURT:  7 through 10.

19        MR. BLACKSTONE:  Right.

20        THE COURT:  12 and 13.

21        MR. BLACKSTONE:  Correct.  That's what I have.

22        THE COURT:  Okay, I'm sorry.

23     Anything else that needs to be corrected?  Okay, good.

24        MR. COVELL:  No, your Honor.

25        THE COURT:  Well then would you like to recall Mr. Fard, Mr.

3

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    Covell?

2        MR. COVELL:  Yes, thank you.

3        THE COURT:  All right, Mr. Fard, if you would come forward

4    and have a seat again, and because it has been so long, we will

5    swear you again.

6        THE CLERK:  Please raise your right hand.  Do you solemnly

7    swear or affirm that the testimony you're about to give is the

8    truth, the whole truth, and nothing but the truth, so help you

9    God?

10       DEFENDANT FARD:  Yes.

11       THE COURT:  Okay, have a seat, and then as soon as you have

12   gotten comfortable, please state your name.

13       DEFENDANT FARD:  My name is Attawwaab Muhammad Fard.

14       THE COURT:  Okay, Mr. Covell?

15                         * * * * *

16            D I R E C T   E X A M I N A T I O N

17   BY MR. COVELL:

18     Q. Mr. Fard, you had previously testified that you had been in

19   business with your brother in the fall of 2003; is that correct?

20     A. Yes.

21     Q. Okay, and you had testified about the expenses that that

22   business incurred with regard to fixtures and graphics; is that

23   correct?

24     A. Um-hum.  Yes.

25       MR. COVELL:  And I believe, your Honor, that that is

                                                              4

1    represented in Exhibit A4, and we would move for its admission.

2         THE COURT:  Okay, let me find those exhibits.  A4.  Mr.

3    Blackstone?

4         MR. BLACKSTONE:  My only -- I would just like the defendant

5    to identify what is in there so we're on the same page.

6         THE COURT:  Would you do that, Mr. Fard?  If you will draw

7    your attention to A4 -- and then if you would identify what that

8    is?

9         DEFENDANT FARD:  It's in the cost of the fixtures and

10   graphics.

11        THE COURT:  The cost of the fixtures and?

12        DEFENDANT FARD:  And the graphics for the display --

13        THE COURT:  All right.

14        DEFENDANT FARD:  -- on the kiosk.

15        THE COURT:  Okay.  Any objection to that exhibit, Mr.

16   Blackstone, or do you need to voir dire more?

17        MR. BLACKSTONE:  No, that's fine, no objection, your Honor.

18        THE COURT:  All right, Exhibit A4 is admitted.

19        MR. COVELL:  Thank you.

20     Q. (By Mr. Covell) And then Exhibits A5 and A6, do you have

21   those in front of you, Attawwaab?

22     A. Yes.

23     Q. Okay, and can you describe them for the record?

24     A. This is receipts from -- they're all purchases -- supplies

25   for the kiosk.

5

*ACE Reporting Services, Inc. (206) 467-6188*

1    Q. Okay, and both A5 and A6 are oils --

2    A. Yes --

3    Q. -- or incense that are related to that?

4    A. Yes, A6 is the incense.

5    Q. A6 is the incense and A5 is the oils?

6    A. Yeah, oils and like lotions and soaps and all kinds of

7    other different products that we sold at the kiosk.

8        MR. COVELL:  We would move for their admission, your Honor.

9        MR. BLACKSTONE:  No objection.

10       THE COURT:  A5 is admitted and A6 is admitted.

11   Q. (By Mr. Covell) And then, Mr. Fard, when you were running

12   this business with your brother, were there distributions

13   received from the receipts of the business to you directly?

14   A. Come again?

15   Q. Were you -- Were the revenues of the business, the profit

16   of the business, were those -- were any funds from the business

17   and what was sold in turn distributed to you?

18   A. Yeah.

19   Q. Okay, and who did that?

20   A. Kareem.

21   Q. And when was the first time you received monies from this

22   business?

23   A. At the end of September.

24   Q. And you and your brother were splitting the proceeds --

25   A. Yes.

*ACE Reporting Services, Inc. (206) 467-6188*

1    Q. -- of the business?

2    A. Yes.

3    Q. 50-50?

4    A. Yes.

5    Q. Okay, and so how much did you receive at the end of

6    September?

7    A. 3200.

8    Q. And then the next distribution was in mid-October; is that

9    right?

10   A. Yeah, that's correct.

11   Q. And how much did you receive then?

12   A. In mid-October around 2700.

13   Q. And then at the end of October you again received some

14   funds?

15   A. 2000, yeah.

16   Q. Okay, and then at the end of November, did you receive a

17   final distribution?

18   A. Yeah, 3500.

19   Q. So altogether that adds up to about $11,400 that you

20   received for those three months that you were operating the

21   business?

22   A. Yeah, that sounds about right.

23      THE COURT:  Could I just verify, Mr. Covell, are you asking

24   him what was distributed, and then split, or what his split was?

25      MR. COVELL:  What his split was.

*ACE Reporting Services, Inc. (206) 467-6188*

1    Q. (By Mr. Covell) Those figures were your split?

2    A. Yes, that's what I myself earned.

3    Q. Your portion?  You got it?

4       THE COURT:  All right, thank you.

5       MR. COVELL:  Thank you, your Honor.

6    Q. (By Mr. Covell) And then during that time of course you had

7  living expenses; can we talk about those?

8    A. Yes.

9    Q. Okay.  What was your monthly rent expense?

10   A. 640.

11   Q. And what about water or sewer?

12   A. Those were about $30.

13   Q. Okay, and approximately how much did you spend per month

14  for food?

15   A. Approximately -- I would say -- it was around -- about

16  $300.

17   Q. And that is for yourself and --

18   A. It's just -- it's just my wife and me.

19   Q. Just your wife and you?

20   A. And my son breast feeds, so he doesn't really --

21   Q. Okay, and then for utilities, how much did you spend a

22  month on that?

23   A. Utilities -- I had, let me see, a light bill, a phone bill

24  -- about -- my electricity bill is about $50 a month.

25   Q. Okay.

*ACE Reporting Services, Inc. (206) 467-6188*

1    A. Well that's all I paid on it was $50 a month, and then my

2   cell -- me and my wife have cell phone bills; that was about $100

3   a month.

4    Q. Okay, and then for transportation, you had an automobile?

5    A. Yeah.

6    Q. Okay.

7    A. Well, yeah.

8    Q. You had an automobile during that period of time?

9    A. Yeah.

10    Q. Okay.

11    A. Yeah.

12    Q. And you paid --

13    A. Up until -- up until about December I had an automobile.

14    Q. Okay, and what were your gas expenses for the automobile?

15    A. Probably about 20 bucks a week, so probably like $80 a

16   month or something like that.

17    Q. And then did you have just some other odds and ends

18   expenses?

19    A. Yeah, like miscellaneous stuff?

20    Q. Um-hum?

21    A. Yeah, but that wasn't that much.  I never really --

22   probably -- at the outside probably like 50 bucks or something.

23    Q. Okay.  So then for the months of September through

24   December, your expenses then were these expenses that you just

25   now testified to; is that correct?

9

1    A. From when?

2    Q. From September through December?

3    A. Yeah.

4    Q. Okay.

5    A. Yeah.

6    Q. So that totals approximately $1250 per month?

7    A. Let's see.  I will need to add it up, but it sounds about

8  right.

9    Q. Okay.

10    THE COURT:  How much was the rent again?

11    DEFENDANT FARD:  640.

12    THE COURT:  640?

13    DEFENDANT FARD:  Yeah.

14    THE COURT:  All right, thank you.

15    Q. (By Mr. Covell) 640 and $30 for water?

16    A. Yeah, I paid them both.  I had to pay the water and the

17  rent together, so it was about 670 altogether.

18    Q. Okay.

19    A. That's how I remember paying.

20    Q. And the electric expenses -- you got a billing every two

21  months for that?

22    A. Yeah, it was every two months.

23    Q. Okay, and so the $50 is what -- you would be splitting that

24  two-month payment into a one-month payment?

25    A. Yeah.

*ACE Reporting Services, Inc. (206) 467-6188*

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    Q. Okay.  Okay, and then you had an accident in December with

2  your car; is that correct?

3    A. Um-hum.

4    Q. What happened?

5    A. I don't remember because I was in a coma, but I remember it

6  was snowing and my car got totaled.

7    Q. So that you had no -- you had no automobile expenses during

8  January and February; is that correct?

9    A. In January and February?

10   Q. Yeah?

11   A. No.

12   Q. Okay.  So then if we deduct the $80 a month for gas, then

13  your expenses would be 1170 a month; is that correct?

14   A. Yeah, if you deduct it.

15   Q. Totaling $2340 for those two months?

16   A. Um-hum.

17   Q. And then as you mentioned, your car was totaled and you

18  proceeded to purchase a new car?

19   A. Yeah.

20   Q. And so how did you go about doing that?

21   A. Uhm -- I just started looking in the Auto Trader for

22  another car -- once I -- because I was out of it for a minute,

23  and my wife and I, we just kept looking in the Auto Trader and

24  calling around, and then finally we found the '94 Lexus.

25   Q. What is the Auto Trader?

*ACE Reporting Services, Inc. (206) 467-6188*

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    A. It's a magazine that sells used cars.

2    Q. And then you found this '94 Lexus?

3    A. Um-hum.

4    Q. And you talked to the owner about purchasing that car?

5    A. Yeah.

6    Q. Okay, what was he asking for it?

7    A. I think 10, but I was trying to get him down to eight

8    because that's all I had, but he wouldn't -- he wouldn't -- he

9    wouldn't go that low so I had to borrow another two -- he wanted

10   -- we paid 10 for it.

11   Q. Okay, and did you meet with him twice with regard to making

12   those payments, or did you --

13   A. Yeah, because the first time I went up there, all I had was

14   eight, and I left that with him.  I was trying to buy it with

15   eight, but he wouldn't go down, so I left him the money, and then

16   I went and borrowed some money from my brother, and then I came

17   back later -- my brother Kareem.

18   Q. Uh-huh.

19   A. Then I came back later and gave him the other two.

20   Q. And where did you get the money for that $8,000 that you

21   left with him?

22   A. From my interest in the oil business and from my mother-in-

23   law, and then that's it.

24   Q. Okay, and you had how much from your mother-in-law?

25   A. 4000.

1    Q. And then the balance was from your business?

2    A. Yeah.

3    Q. Okay.  And Kareem of course had been working on the

4   business with you, so you were aware of that; did he have any

5   other sources of income?

6    A. Yeah, he got -- that I know, he had Social Security from

7   his sons; I got like $1000 a month for -- I think he had two sons

8   that are sickle-cell and I gave him like $1000 apiece for them,

9   or something like that.

10      MR. COVELL:  That's all the questions I have, your Honor.

11      THE COURT:  Okay, Mr. Blackstone?

12                        * * * * *

13           C R O S S - E X A M I N A T I O N

14  BY MR. BLACKSTONE:

15   Q. Mr. Fard, when did you set up this business with your

16  brother?

17   A. When did I open up the store?

18   Q. When did you begin your business with your brother?

19   A. September.

20   Q. Of '03?

21   A. Yeah.

22   Q. Prior to that you had no business with your brother?

23   A. Yes, I did.

24   Q. So when did you start that business with your brother?

25   A. The oil business?

                                                          13

*ACE Reporting Services, Inc. (206) 467-6188*

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    Q. Any business -- whatever business you started with your

2  brother, when did you begin it?

3    A. Uhm -- I think in early -- let me see, early in 2003 I was

4  helping him sell clothes and stuff like that, so -- but that

5  wasn't incense and oils.

6    Q. What was your employment before you started this business?

7  Did you have any employment?

8    A. Yes, I was a merchant.

9    Q. Merchant?

10   A. Yes.

11   Q. What were you doing?

12   A. I was selling incense and oils on the street.

13   Q. For who?

14   A. Myself.

15   Q. What was the name of your company?

16   A. I didn't have a name.

17   Q. Okay.

18   A. I was selling for my personal self.

19   Q. You were in prison in Oklahoma, right?

20   A. Yes.

21   Q. When did you come to Washington State?

22   A. I think I came in at the end of 2001 or the beginning of

23  2002, something like that.

24   Q. And since you got here, your employment has always been

25  running your own incense business?

                                                                    14

1       A. Yeah.

2       Q. You've never worked for anybody else?

3       A. Since I've been in Seattle?

4       Q. Yes?

5       A. No.

6       Q. No one has paid you a paycheck?

7       A. No.

8       Q. No one has withheld taxes from your --

9       A. No.

10      Q. -- check?  You've been self-employed that whole time?

11      A. That's right.

12      Q. What name have you done business under during the time

13   you've been here?

14      A. I didn't do business under -- just my own name.  I had my

15   own account set up with this company, Medina, Inc., and I just

16   ordered oils from them and sold them by myself.

17      Q. Now while you were in the state of Washington, you were

18   being supervised by the Department of Corrections, weren't you?

19      A. Um-hum.

20      Q. That's a yes?

21      A. Yes.

22      Q. And who supervised you?

23      A. At the Department of Corrections?

24      Q. Yeah?

25      A. The Department of Corrections.

15

*ACE Reporting Services, Inc. (206) 467-6188*

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    Q. Was there an individual there that supervised you?

2    A. Yeah, I had various different parole officers.

3    Q. Did Lewis Rayner (phonetic) supervise you?

4    A. Yes.

5    Q. And as a condition of your supervision, you had to fill out

6    a monthly offender report, didn't you?

7    A. Yes.

8    Q. And you were told that you had to fill that out truthfully,

9    weren't you?

10   A. No.

11   Q. Yes?

12   A. No.

13   Q. You didn't know you had to fill that out truthfully?

14   A. No, no one told me that, but --

15   Q. You didn't understand that if you lied on that form you

16   could be subject to a probation violation?

17   A. No one ever told me that.

18   Q. Doesn't it say it right on the form, Mr. Fard?

19   A. I don't remember reading that.

20   Q. And you filled those reports out every month, didn't you?

21   A. Well, yeah.

22   Q. And you lied on that form about what you were doing for a

23   living, didn't you?

24   A. I don't recall.

25   Q. Didn't you say you were employed by some company called the

16

*ACE Reporting Services, Inc. (206) 467-6188*

1    Sweet Spot on Jackson Street in Seattle?

2        A. The Sweet Spot is nothing but an incense and oils spot that

3    distributes oils wholesale.

4        Q. But the fact is you never worked for the Sweet Spot, did

5    you, Mr. Fard?

6        A. Well technically, I was working for them, but for myself as

7    an independent merchant.

8        Q. Did the Sweet Spot give you a paycheck every month, Mr.

9    Fard, for your work?

10       A. No, but I order oils from them wholesale.

11       Q. But you weren't on their payroll; they were a supplier of

12   oils for you, weren't they, Mr. Fard?

13       A. Yeah.

14       Q. And in fact on these reports you said you were a customer

15   service employee of this company?

16           MR. BLACKSTONE:  If I might approach, your Honor?

17           THE COURT:  Yes.

18       Q. (By Mr. Blackstone) Showing you, Mr. Fard, what has been

19   marked as Government Exhibit 14, those are a series of offender

20   reports, which I believe you filled out, and if you will look at

21   them for us and see if you can identify your handwriting on

22   those?

23       A. Uh-huh.

24       Q. Is that your handwriting?

25       A. Yes, sir.

17

*ACE Reporting Services, Inc. (206) 467-6188*

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    Q. And you prepared those every month.  The first one in the

2  back of the packet was submitted in February of 2003; go to the

3  last page of that exhibit.

4    A. The blue one?  Yeah.

5    Q. And that is your signature there, right?

6    A. Yeah.

7    Q. And this form asks you to say who your employer was; who do

8  you say your employer was on this form, Mr. Fard?

9    A. Sweet Spot.

10   Q. And you say you worked as a customer service person?

11   A. Yeah.

12   Q. That wasn't true, was it?

13   A. Well it is true.

14   Q. You didn't work for Sweet Spot?

15   A. Well technically I did.

16   Q. They gave you a paycheck?

17   A. No, they didn't have to pay me in a paycheck.  I was

18  basically doing business with the Sweet Spot because I was buying

19  my oils from them wholesale, and then I would keep coming back

20  and giving them parts of the money, and re-upping my orders.

21   Q. Right, they supplied you with a product you sold.  You

22  weren't working for them; they were your supplier, right, Mr.

23  Fard?

24   A. Yeah, if you want to say it like that, yeah, if that's how

25  you view it.

18

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

USA v. Attawwaab Fard - CR 04-521 JCC - (7/26/2005) - P. 19

1    Q. And then go to the next form, March of '03.  See that one?

2    March 5 you signed it?

3    A. This gray one?  Yeah.

4    Q. And you had a phone number --

5    A. March 19.

6    Q. You have a phone number there for the Sweet Spot, right,

7    250-9699?  That is your brother's cell phone, isn't it?

8    A. Yeah.

9    Q. Did he work at the Sweet Spot, too?

10   A. He used to sell oils for them, too.

11   Q. But he wasn't working for the Sweet Spot, was he?

12   A. You're not -- I see what you're trying to say but how it

13   worked was -- the brother's name is Abdul Latey (phonetic), and

14   we get oils from him wholesale, right?  And then we go out and

15   sell them, so I used to use the Sweet Spot because the Sweet Spot

16   was an established business that if my probation officer ever

17   wanted to go talk with anyone, they could go there and talk with

18   them instead of just trying to find me, you know, downtown

19   selling oils.  That's what --

20   Q. Did you tell Mr. Rayner that, that you really didn't work

21   for the Sweet Spot, but it was a convenient place for him to

22   locate you?  Did you ever tell him that?

23   A. I told him that I got oils -- oils from the Sweet Spot

24   wholesale, yes.

25   Q. Did you tell him you really didn't work there for them,

19

*ACE Reporting Services, Inc. (206) 467-6188*

1   they were a supplier?

2      A. I view it as I was working for them.

3      Q. And in fact, Mr. Fard, you didn't give him the phone number

4   for the Sweet Spot, you gave him your brother's number?

5      A. Uh-huh.

6      Q. Leading him to believe that was the Sweet Spot?

7      A. Well I put the Sweet Spot number on there, too.

8      Q. Do you see the Sweet Spot's number on here anywhere?  Every

9   single one of these seems to have your brother's cell number on

10  it:  250-9699.  250-9699.

11          (Brief Pause in Proceedings)

12      THE COURT:  Do you remember the question?

13     A. What was your question?

14     Q. (By Mr. Blackstone) You said you gave the number for the

15  Sweet Spot on here, and the only phone number I see on here, and

16  maybe I missed it, is the number for your brother?

17     A. I thought I did it.

18     Q. You thought you did?  Where is it, then?

19     A. I don't see it in these ones.

20     Q. And then, Mr. Fard, when you set up this business at the

21  Tacoma Mall, that was from September until November of 2003,

22  correct?

23     A. Yes.

24     Q. Look at the September offender report, which is about

25  the -- they're all in date order; can you find the one that you

20

*ACE Reporting Services, Inc. (206) 467-6188*

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    signed on September 10, 2003?

2           (Brief Pause in Proceedings)

3    Q. (By Mr. Blackstone) Have you found that one, Mr. Fard?

4    A. Yeah.

5    Q. Okay, September 10 of '03 you signed that, correct?

6    A. September -- 9/10/03 -- yeah.

7    Q. And you see at the top of that form it says:  Must be

8    filled out completely and correctly to be valid.  Failure to do

9    so will be considered a violation of your supervision.

10       Were you aware of that when you signed this form, that if you

11   lied on the form you could be subject to a probation violation?

12   A. I never read that on there.

13   Q. Didn't Mr. Rayner explain that to you, that you have to

14   fill out these forms truthfully and completely, and if you lie on

15   them, you can be subject to a violation?

16   A. No, he did not.

17   Q. Okay.  Look on this form:  By September 10 you were up and

18   running at the Tacoma Mall, right?

19   A. I think so, yeah.

20   Q. You ever mention on here that you are working at the Tacoma

21   Mall with your brother?

22   A. I can have two jobs.

23   Q. But you weren't working at the Sweet Spot, were you?

24   A. I still was selling oils on my own, too.

25   Q. Oils you bought from the Sweet Spot?

21

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    A. Yeah.

2    Q. They never gave you a paycheck?

3    A. As a matter of fact, a lot of the oils that we got didn't

4  even come from -- well, let me see, not the oils, but we had

5  gotten a lot of candles, and yeah, our big giant incense that we

6  had gotten came from the Sweet Spot, too.

7    Q. But they never gave you a paycheck, did they?

8    A. No.

9    Q. Do you remember Mr. Rayner asked you for a paycheck proving

10 that you worked at the Sweet Spot?  Do you remember that, Mr.

11 Fard, he asked you for a paycheck, and you gave him one, didn't

12 you?

13   A. I don't recall.

14      MR. BLACKSTONE:  If I might approach, your Honor?

15      THE COURT:  Yes.

16   Q. (By Mr. Blackstone) I'm showing you what has been marked as

17 government's Exhibit 15, Mr. Fard.

18   A. Um-hum.

19   Q. And that is a check purportedly drawn on the account of the

20 Sweet Spot, isn't it?

21   A. Yeah.

22   Q. And it is a check that is payable to you?

23   A. Uh-huh.

24   Q. For $412.93?

25   A. Uh-huh.

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

USA v. Attawwaab Fard - CR 04-521 JCC - (7/26/2005) - P. 23

1    Q. And it says "payroll."

2    A. Uh-huh.

3    Q. You gave this check to Mr. Rayner as proof that you were

4  working for the Sweet Spot, didn't you?

5    A. Yeah, because he wanted me to bring him something on --

6  that he can put in his documents.

7    Q. And this was a phony check that you created, wasn't it, Mr.

8  Fard?

9    A. Yep.

10   Q. Did you tell Mr. Rayner that this was a false check you

11 made --

12   A. No.

13   Q. -- to deceive him?

14   A. No.

15   Q. So why did you give him a phony check?

16   A. Because he told me that he needed something tangible, that

17 just me saying that I work for the Sweet Spot, and I'm a

18 merchant, is not good enough, so that's why I printed that out to

19 give it to him.

20   Q. But it is a false check?  You didn't work there?

21   A. I did -- Okay, you want to say I didn't work there, I

22 didn't work there.

23   Q. This check wasn't given to you by the Sweet Spot, was it?

24   A. No, I made that check.

25   Q. You made this check on your computer, right?

23

1    A. Yeah.

2    Q. You cooked up this account number, you typed in "payroll"?

3    A. That's right, I made the check.

4    Q. It's all a big lie, right?

5    A. If you want -- yeah, it's a lie.

6    Q. And you were doing that to deceive --

7    A. The check is a lie, yeah.

8    Q. You were doing that to deceive Mr. Rayner, weren't you?

9    A. Well yeah because he had told me that I needed to bring

10   something to him tangible, so that's why I had to bring that to

11   him.

12   Q. Now when did you move to your residence in University

13   Place?  That place got searched by the FBI on November 18, 2004;

14   when did you move to that residence?

15   A. I don't recall.

16   Q. What?

17   A. I don't recall.

18   Q. Any idea?

19   A. No.

20   Q. You never told Mr. Rayner you were living at that

21   residence, did you?

22   A. I told him that I was going between that residence and the

23   residence with my other brother in Renton.

24   Q. But on those offender reports you never listed that

25   address, did you, the one in University --

24

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    A. No because I told him -- he didn't require me to put that

2    address down.

3    Q. Your testimony is --

4    A. He has the address, but I didn't fill it out on these

5    little forms.

6    Q. Just so we're on the same page here, in those offender

7    reports, which are Exhibit 14, the last report was submitted in

8    September of 2004; that is the first page of Exhibit 14.  Do you

9    have Exhibit 14 in front of you there?  Look at the top report.

10   A. October 19?

11   Q. Well it says -- it's dated September 28 of '04 by you, and

12   it is stamped September 24 on the top; do you see that one?

13   A. The first --

14   Q. The first one, yes.

15   A. It says October 19.

16      MR. COVELL:  The one I have says October 19.

17      MR. BLACKSTONE:  Okay.

18   Q. (By Mr. Blackstone) What does that show as your address

19   where you're living?

20   A. My brother's address.

21   Q. Which is what?

22   A. In Renton.

23   Q. You weren't living there, were you?

24   A. No, but I used to stay there periodically.

25   Q. Where were you really living with your wife?

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    A. Yeah.

2    Q. What was your true address?

3    A. On October 19, 2004?  The address in University Place.

4    Q. 3660 --

5    A. Bridgeport.

6    Q. Bridgeport Way?

7    A. That's correct.

8    Q. So why didn't you put that address down on this form, Mr.

9  Fard?

10   A. Well my probation officer already had that address, and if

11 you keep -- I had already previously changed my address a lot; if

12 you keep changing your address, then you keep getting different

13 probation officers, so I just left them with the same address

14 that I've been having when I was first living there.

15   Q. And these were offender reports -- I don't see anywhere

16 where you put down your address in University Place; did you fill

17 out a form like the offender report that you were living at 3660

18 Bridgeport?

19   A. No, I didn't.  This offender report is not the only

20 documents that he takes down.  This is just what you fill out in

21 the lobby.  When you go in and talk to him, you've got to fill

22 out some other stuff, too.

23   Q. Okay, but you are confident that you told Mr. Rayner that

24 you were living in University Place?

25   A. He knows -- yeah.  He has the address.

*ACE Reporting Services, Inc. (206) 467-6188*

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    Q. He had no problem with you putting down here that you were

2    really -- that your address was your brother's address?  That

3    didn't bother him at all?  Okay.

4    Now --

5        THE COURT:  Did he answer the question?

6        DEFENDANT FARD:  He said did he have any problem with it --

7        MR. BLACKSTONE:  And I think you testified Mr. Rayner had no

8    problem with that?

9        DEFENDANT FARD:  Is that I take it that he didn't, because

10   he knew about both addresses.

11   Q. (By Mr. Blackstone) So the minute you moved to --

12   A. And he had my cell number and it's not like he couldn't

13   find me, but what does that have to do with this car?

14   Q. It has to do with your credibility; whether you are

15   truthful or not; whether you lie to people or not.  That's what

16   it has to do with, Mr. Fard.

17   A. Okay.

18   Q. See?  Because these forms say you're supposed to tell the

19   truth.

20   Now when the FBI searched your apartment, you were still

21   making phony checks, weren't you?

22   A. Yeah, periodically.

23   Q. You had a Manpower check on your computer, didn't you?

24   A. Yeah.

25   Q. And that was a check you got from your brother, right, Mr.

*ACE Reporting Services, Inc. (206) 467-6188*

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    Ali Brown?

2      A. No.

3      Q. Well didn't you scan one of his payroll checks into your

4    computer?

5      A. Yeah.

6      Q. Where did you get that payroll check from?

7      A. Well Ali -- his address -- he didn't really have a place to

8    stay.  When he was working for Manpower, he was staying in

9    different spots, so he asked me if he could have his checks sent

10   to my apartment, so when they were sent to my apartment, I just

11   opened it up and scanned it.

12     Q. He didn't know you were doing that?

13     A. No.

14     Q. And then you took some of those checks and deposited them

15   into your wife's account, didn't you?

16     A. That is correct.

17     Q. How did you get access to her bank account?

18     A. I stole it.

19     Q. You stole what?

20     A. I stole her bank information.

21     Q. You had her PIN number?

22     A. We live together.

23     Q. And then you deposited those checks into her account, and

24   what happened after you did that?

25     A. I got arrested.

*ACE Reporting Services, Inc. (206) 467-6188*

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    Q. Didn't you withdraw money from that account?  You took

2    money out of your wife's account?

3    A. Yeah.

4    Q. And what did you do with her bankcard?

5    A. I still had it.

6    Q. Okay.  Did you tell her you had done this?

7    A. No.

8    Q. And you also had a couple of phony cashiers checks in your

9    car at the time of your arrest payable to somebody named Chester

10   George?

11   A. That's what the evidence shows, yes.

12   Q. Who made those?

13   A. Those I don't know about.

14   Q. They were in your car?

15   A. I know, but I didn't do those.

16   Q. Do you know who did them?

17   A. Probably my brother.  I didn't do those.

18   Q. Was your brother kind of the leader of this whole scam?  He

19   was the organizer of it?

20   A. That's what you guys have been saying, so yeah.

21   Q. What do you think?  You were in it.

22   Q. I mean he was the oldest.  I mean -- yeah, pretty much,

23   yeah.

24   Q. Would you say you were the number two in command in the

25   operation?

1    A. There was only two of us.

2    Q. Well your brother was involved, wasn't he?

3    A. Who, Ali?

4    Q. Yeah?

5    A. No.

6    Q. Well he pled guilty to being involved in the conspiracy,

7    didn't he?

8    A. Yeah, that's because he didn't have a choice, but Ali never

9    did nothing with us.

10   Q. Okay, well he had a choice and he chose to plead guilty, so

11   that tells you something.

12   A. Yeah, was he going to go to court against you guys and get

13   found guilty?

14   Q. Now how long were you involved in this scheme for, this

15   bank fraud scheme?

16   A. Uhm -- I have been involved with it off and on for

17   different periods of time.  I was never just consistently -- you

18   know, involved in the scheme and stuff.

19   Q. But during the whole time you were involved in this, you

20   were on probation being supervised by DOC, weren't you?

21   A. Yeah.

22   Q. And you knew that if you engaged in another crime, that

23   would be a violation of your conditions of release; is that

24   right?

25   A. Um-hum.

30

PDF Complete
Click Here & Upgrade
Expanded Features
Unlimited Pages

1    Q. That's a yes?

2    A. Um-hum.

3    Q. You've got to answer yes or no.  They can't --

4    A. Yes.

5    Q. Okay.  Now when you had this -- oh, also at the time that

6    you got arrested, you had a false passport in your possession,

7    didn't you?

8    A. Yeah.

9    Q. What were you using that for?

10   A. I was going to go and make Hajj.

11   Q. Go what?

12   A. And make Hajj.

13   Q. To Saudi Arabia?

14   A. Yeah.

15   Q. Okay.  Did you ever travel to Canada while you were in this

16   country?

17   A. Yeah.

18   Q. When did you go to Canada?

19   A. Are you -- it's clear that if you are trying to ask me if I

20   violated my probation, that's clear because I'm in jail, but I'm

21   not seeing your point.  You already said okay, I lied about this

22   check right here.  That's clear --

23   Q. I didn't say that; you admitted that it was a phony check,

24   right?  I'm not putting words in your mouth, am I?

25   A. All right, so what -- what are you leading to?

31

1    Q. I'm trying to -- have you gone to Canada at all since

2    you --

3         MR. COVELL:  I'm going to object to the relevancy of that --

4         MR. BLACKSTONE:  -- have been in this state?

5         MR. COVELL:  -- question, your Honor.

6         THE COURT:  Repeat the question.

7    Q. (By Mr. Blackstone) Have you traveled to Canada since you

8    have been back in Washington State beginning at sometime in 2001?

9         THE COURT:  Answer the question.

10   A. Did I travel -- and that has what to do with this?

11        THE COURT:  You need to answer the question and not ask a

12   question.

13   A. I've already answered yes to that when I talked to you guys

14   before.

15   Q. (By Mr. Blackstone) Okay, so when did you go to Canada,

16   then, Mr. Fard?

17   A. I don't recall when.

18   Q. But it was after you were released to Washington State and

19   under the supervision of DOC?

20   A. Yeah.

21   Q. Yes?

22   A. Yeah.

23   Q. Did you get permission from DOC to travel to Canada?

24   A. No.

25   Q. How many trips did you take to Canada?

1    A. Just one.

2    Q. And what was the purpose of that trip?

3    A. I was on Kroach (phonetic).

4    Q. On what?

5    A. I was on Kroach.

6    Q. I'm not following that, what is the word?

7    A. It's like an Islamic Jamal thing -- an Islamic like group

8    thing.

9    Q. Did you meet with your wife's parents when you were in

10   Canada on that trip?

11   A. What is the point of this?

12       THE COURT:  Mr. Fard, you need to answer the questions,

13   unless there is an objection, and unless I sustain the objection,

14   so unless the objection is sustained, you need to answer it.

15       DEFENDANT FARD:  Well can I have an objection?

16       MR. COVELL:  I'll object, your Honor.

17       THE COURT:  On what basis?

18       MR. COVELL:  Relevancy.

19       THE COURT:  The objection is overruled, so you do need to

20   answer.

21     Would you like to repeat the question?

22       DEFENDANT FARD:  Yes.

23   Q. (By Mr. Blackstone) Did you meet with your wife's parents

24   while you were in Canada?  And the answer is yes?

25   A. Um-hum.

33

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    Q. Did they provide you with any money when you were there?

2    A. No.

3    Q. Okay.  Now I think your wife's mother-in-law, or your

4  mother-in-law testified that she provided $4000 in cash to you?

5    A. Yeah.

6    Q. Were you present when she handed the cash over?

7    A. No.

8    Q. When did this happen, do you know?

9    A. When she had came down when my wife had the baby.

10   Q. And when was that?

11   A. That was in February.

12   Q. Of 2004?

13   A. Yeah.

14   Q. And did your mother-in-law stay with you at your residence?

15   A. Yeah.

16   Q. Did you see the cash after your wife got it?

17   A. Yeah.

18   Q. What did you do with it?

19   A. Put it in the drawer.

20   Q. You didn't have a bank account at this time, did you?

21   A. Uhm -- I don't recall, but I don't really keep money in the

22  bank anyway.

23   Q. You didn't have a bank account?

24   A. I don't recall.

25   Q. Do you think you might have had a bank account?

34

1    A. I don't recall.

2    Q. How did you pay for that Lexus?

3    A. With cash.

4    Q. Do you think if you had a bank account you would have

5  written him a check, wouldn't you have?

6    A. No.

7    Q. So you may have had a bank account and you may not have,

8  you can't remember?

9    A. I don't remember, but even if I did have a bank account, I

10  would not have put my money in the bank because I don't put my

11  money in the bank.

12    Q. Well your wife had a bank account, didn't she?

13    A. Yes she did, but I don't think she had that bank account

14  until -- until like a few months before I got arrested.  I'm not

15  sure.

16    Q. Okay.  Did your mother-in-law give you any other cash

17  besides that $4000?  You never saw her give it, right?  You

18  just --

19       MR. COVELL:  Asked and answered.

20    A. Yeah.

21       THE COURT:  Go ahead, it's been awhile.

22    Q. (By Mr. Blackstone) Okay, did you actually see your mother-

23  in-law hand the cash to your wife?

24    A. No.

25    Q. So your wife just told you that she had gotten $4000 from

35

*ACE Reporting Services, Inc. (206) 467-6188*

1  her mother; is that correct?

2      A. Yeah, she was still -- her mother was still there and I

3  went and told her thank you and stuff like that.

4      Q. And she said, You're welcome?

5      A. Yeah, but I didn't necessarily see her put it in her hand

6  like that, though.

7      Q. Why did she give your wife $4000?  What was that for?

8      A. So that we could buy a car.

9      Q. Okay.  Had she given you money on any other occasion?

10     A. Plenty of times.

11     Q. And that money is usually sent to you by Western Union or

12  Moneygram, wasn't it?

13     A. Sometimes, but she brings money down, too.

14     Q. How often would she come down to see you?

15     A. Almost once a month.

16     Q. Did she –

17     A. They used to come down a lot.

18     Q. -- always bring you money?

19     A. Yes, a lot.

20     Q. Is this the most amount of money she's ever given you, the

21  $4000?

22     A. No.  She's given us plenty of money before.

23     Q. But she introduced all these Western Union things; it looks

24  like she was sending $200, $300, $400; we never saw any big-

25  ticket -- any big amounts coming down to you?

36

1    A. Well who wants to pay the tax on that, trying to send a

2  Western Union -- they charge like 20%.

3    Q. So you're saying when she brought you a lot of money, she

4  would hand carry that down from Vancouver to this area?

5    A. I don't -- she brought us plenty of money before, that's

6  all I know.

7    Q. But you had plenty of money from your business, right?

8    A. From the incense and oil business?

9    Q. Yeah, to cover your expenses?

10   A. As of when?

11   Q. As of March of 2004?

12   A. No, in March all I had was like $4000 left.

13   Q. You want to say that again?

14   A. In March all I had was around $4000 from my incense and oil

15  business left.

16   Q. And that $4000 came from the $11,000 you had gotten from

17  the business you ran at the mall, right?

18   A. That is correct.

19   Q. And how were you paid that money, the $11,000?

20   A. Cash.

21   Q. And again, you didn't put it in a bank account?

22   A. No.

23   Q. You just kept it in your home?

24   A. Yeah.

25   Q. So how much cash did you have it your home at any one given

ACE Reporting Services, Inc. (206) 467-6188

1    time?

2      A. Uhm -- I don't know, different amounts, I mean --

3      Q. What is the most you ever had at your house?

4      A. That $8000, I think.

5      Q. Okay, and how did you pay all of your bills?

6      A. Money orders.

7      Q. Did you have to go down and pay for a money order every

8    time?

9      A. Yeah, there was a Safeway right around the corner.

10     Q. But if you had a checking account, wouldn't it have made

11   sense just to pay those bills with your checks, and not have to

12   incur the fee of a --

13     A. $.75 money order?  No.

14     Q. Okay, so you think you might have had a bank account?

15     A. Huh?

16     Q. You think you might have had a bank account during this

17   timeframe, prior to the time you bought the car?

18     A. Yeah, I think so.

19     Q. But you never put any money into it, I take it?

20     A. No.

21     Q. Wouldn't that have been a safe place to keep your money so

22   it won't get stolen from your apartment?

23     A. No.

24     Q. Okay.  Now this business -- how often were you at the

25   business, the one you had at the mall?

38

1    A. A lot.

2    Q. Okay.  And you were there doing what?

3    A. Selling incense and oils.

4    Q. And you understood you were supposed to pay rent of $1700 a

5    month for September and October; is that correct?

6    A. Yeah.

7    Q. And you made those rental payments?

8    A. Yeah.

9    Q. And then in November the rent went up to $5,500?

10   A. Yes, that's correct.

11   Q. Did you pay that?

12   A. No.

13   Q. You had enough funds to pay it, didn't you?

14   A. Well, on the books we did, but when the time came, no.

15   Q. Okay.  And you also understood under the rental agreement

16   you were supposed to report your gross sales every month to the

17   mall; isn't that correct?

18   A. I have now read that in the contract, but before, no.

19   Q. Well in fact during the first month there you reported your

20   gross sales to the mall of $6,400, didn't you?

21   A. No.

22   Q. Well if you can look for me at Exhibit -- I think the

23   original exhibits are up there.

24   A. Oh, I know what you're talking about, but that was my

25   brother.  I didn't do it.

39

1    Q. Okay, but somebody in your -- I want to just make sure

2    we're on the same page you're, Mr. Fard; it is Exhibit 7, just

3    for the record, and that's something we got from the mall showing

4    gross sales of $6,400 in the month of September; so your brother

5    reported that number is what you're saying?

6        A. Yeah.

7        Q. So at least your brother knew he was supposed to report the

8    gross sales?

9        A. Well, I remember him sending around some little forms that

10   you fill out.  I remember receiving at least one of them while I

11   was in the mall.

12       Q. Well you signed the lease agreement on behalf of your

13   company, didn't you?

14       A. Yeah.

15       Q. And did someone at the mall explain to you what the terms

16   of the lease were?

17       A. Not really, I mean she was just -- when I was filling out

18   the forms with her, there was a whole bunch of little fine print,

19   and she was just like, Oh, this is nothing, this is just talking

20   about, you know, this, this, and this, and she says, Put your

21   initials, put your initials, so I was just basically just going

22   through it.  I didn't sit there and read it line for line.

23       Q. Okay, so you didn't understand that you had to report your

24   gross sales to the mall?

25       A. No.

Click Here & Upgrade
Expanded Features
Unlimited Pages

PDF
Complete

1    Q. But your brother apparently understood that?

2    A. Yeah, because, like I said, I do recall them sending around

3    some forms, like they give you this piece of paper, and it tells

4    you on there to like put how much you made, and stuff like that.

5    Q. Okay, so why didn't you fill out that form for the months

6    of October and November when you were there?

7    A. When I had gotten that form, we were about to get kicked

8    out of the mall, so I didn't even fill it out.

9    Q. But you now recognize you didn't report your gross sales

10   figure for either October or November?

11   A. That's clear.

12   Q. So we have no idea how much money you made during those two

13   months?

14   A. I mean not according to the mall, no.

15   Q. And you're claiming you made close to $30,000 in gross

16   income from this operation?

17   A. That is correct.

18   Q. And you understood you had to pay some of that to the state

19   of Washington for sales tax, didn't you?

20   A. Not really, no.

21   Q. Didn't you get a letter from the state of Washington

22   telling you you had to file quarterly excise tax returns?  Why

23   don't you look for me at Exhibit 4, Mr. Fard.

24       MR. BLACKSTONE:  I think the clerk has Exhibit 4 -- or is it

25   up there?

ACE Reporting Services, Inc. (206) 467-6188

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    Q. (By Mr. Blackstone) The exhibit number is in the lower

2    right-hand -- remember the state of Washington told you you had

3    to file quarterly sales tax returns, Mr. Fard?

4    A. I don't ever remember seeing this.

5    Q. Okay, it is addressed to the Game, Inc., which you were a

6    principal in, weren't you?

7    A. What does "principal" mean?

8    Q. You were an officer in that?

9    A. Part of?

10    Q. Partnership, shareholder, whatever you want to call it?

11    A. Yeah.

12    Q. So you're telling me you've been in business now since 2001

13    and you never knew you had to file or pay sales tax to the state

14    of Washington?

15    A. I've been self-employed since 2001, and I understand that.

16    I went to prison when I was 15 years old, and when I got out, I

17    just started selling incense and oils to support myself, so I

18    never really knew about taxes.

19    Q. Well you know enough, Mr. Fard, to charge customers 8%,

20    didn't you?

21    A. I didn't really charge tax.

22    Q. Well who set the price for these items you sold?

23    A. We did; my brother and I.

24    Q. Didn't your brother charge -- factor in 8% or 8 1/2% for

25    sales tax?  I believe he testified to that.

ACE Reporting Services, Inc. (206) 467-6188

1    Q. I think sometimes they were, but I didn't.

2    Q. So you weren't aware that your company was charging people

3    sales tax?

4    A. No.

5    Q. I mean when you buy stuff at a store, you always pay sales

6    tax, don't you?

7    A. Yeah, but when I sold incense and oils, when the people

8    bought from me, I didn't charge them tax.

9    Q. Why did you think you were exempt from having to charge

10   sales tax?

11   A. I just wasn't really very conscious of it.

12   Q. Okay, so you weren't really conscious of what the business

13   was doing, were you, Mr. Fard?  You weren't paying attention?

14   A. I thought you weren't putting words in my mouth?

15   Q. I'm allowed to do that.  You weren't paying attention to

16   what was going on with this business, were you, Mr. Fard?

17       DEFENDANT FARD:  Can I get an objection, because --

18       THE COURT:  Well, you can answer yes or no.

19       DEFENDANT FARD:  Well that question is broad.  I'm not aware

20   of anything that's going around with the business?

21   Q. (By Mr. Blackstone) Well let me try to help you.  Your

22   brother said he worked for you.  Your brother said he was there

23   every day.  He said that you told him what to do.  Your brother

24   testified that they charged people sales tax.  Your brother

25   wouldn't have made that up --

43

1    A. So why don't you just say was I aware that my brother was

2  selling -- was charging sales tax instead of saying I wasn't

3  aware of anything the business was doing?

4    Q. Okay, let's go with that question.

5    A. All right.

6    Q. Were you aware your brother was charging people 8 1/2

7  percent for sales tax?

8    A. No, I was not.

9    Q. So where did he get that idea from, just made it up?

10   A. He probably got it from Kareem.  It wasn't from me.

11   Q. Okay.  Who maintained that ledger book that Mr. Covell has

12  shown us?

13   A. Uhm --

14   Q. Whose writing is that?

15   A. The ledger was mainly maintained by Ali and Kareem.

16   Q. And where was it kept?

17   A. It was kept in the kiosk.

18   Q. And after you shut the business down in December of '03,

19  where was it kept?

20   A. I think in storage --

21   Q. Where?

22   A. -- with all the other stuff.

23   Q. Where?

24   A. At the apartment you guys kicked in the door to.

25   Q. Which apartment?

1    A. University Place.

2    Q. Agent Gutt will tell you he never found this ledger book in

3    his search of your apartment?

4    A. Yeah, you guys didn't really search very well, because

5    there's a storage that you guys missed everything up in there.

6    Q. And where was it -- was it a storage locker in the house?

7    A. No, it's a storage -- every apartment you get storage; we

8    had storage to our apartment, and you guys didn't even search it.

9    Q. So the storage was not in your apartment itself, it was

10   outside the apartment --

11   A. Yeah.

12   Q. -- is what you're saying?  Okay, like a separate locker

13   that the apartment --

14   A. Yeah.

15   Q. And in that you had this ledger book, which is Exhibit A2?

16   A. Yeah.  Not only that, but all kinds of other merchandise.

17   Q. But you didn't have any of the underlying documents

18   supporting this ledger, did you, like the cash register receipts?

19   A. There was receipts to it, too.

20   Q. Well do you know what happened to those?

21   A. They've been admitted into evidence.

22   Q. Well let me make -- the exhibits your attorney introduced

23   into evidence related to your expenses, what you paid for your

24   fixtures and your oils and your incense; what I am looking for

25   are the documents that show your sales, like cash register --

45

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1   when someone came in and bought something, I assume there was a

2   cash register receipt generated; where are those?

3      A. We have some of those, too.

4      Q. Do you see them anywhere in here?

5      A. No, but --

6      Q. What happened to those documents, Mr. Fard?

7      A. Let me see.  All of the bundles of -- because we did, we

8   had bundles and bundles of receipts, and plus not only that, but

9   we got the receipts from each month.

10     Q. Okay, where are those?  I'm talking now about the sales

11  receipts that show how much you sold?

12     A. The individual receipts?

13     Q. Yeah, what happened to them?

14     A. I don't know what happened to them.

15     Q. Weren't they in that storage locker that we missed?

16     A. Yeah.

17     Q. So what happened to them?  How come they're not here today?

18     A. I don't know.

19     Q. Did you throw them out?

20     A. No.  When my wife moved, maybe she threw them out, because

21  it's just like a big trash bag full of a whole bunch of different

22  receipts.

23     Q. But you don't know what happened to those things, do you?

24     A. No.

25     Q. But you're telling us you did in fact have some sort of

*ACE Reporting Services, Inc. (206) 467-6188*

1    receipts that would support the entries in your ledger?

2       A. Yeah, a whole bunch of receipts came off the cash register

3    when you buy stuff.

4       Q. Okay, but you don't know where those are today?

5       A. I think my wife lost them in the moving or threw them away,

6    I don't know.

7       Q. You think or you know?

8       A. I don't know.

9       Q. You're making that up, then?

10      A. I don't -- huh?

11      Q. Did your wife tell you she threw out the receipts?

12      A. I don't know.

13      Q. Okay.

14      A. That's what I'm saying.

15      Q. Did you -- I take it you have not filed any federal tax

16   returns since you've been living in Washington State?

17      A. Didn't you just ask a bunch of questions about taxes and I

18   told you I haven't been paying taxes?

19      THE COURT:  Mr. Fard, you need to answer that question.  He

20   asked you if you filed any federal income taxes, so you need to

21   answer that.

22      A. No.

23      Q. (By Mr. Blackstone) You had income in 2001, 2002, and 2003,

24   didn't you?

25      A. Yeah.

47

1    Q. But you never filed income tax returns, did you?

2    A. No.

3    Q. Have you ever paid a dime in income taxes?

4    A. No, I've never paid taxes before.

5    Q. But you had enough money so you should have paid taxes,

6  right?

7    A. I told you I wasn't really very aware of taxes.

8        MR. BLACKSTONE:  Now I forgot to move into evidence Exhibits

9  14 and 15.  14 were the offender reports and 15 was that check

10  from the Sweet Spot.  We would offer that.

11       THE COURT:  Right.  Mr. Covell?

12       MR. COVELL:  I have no objection.

13       THE COURT:  Exhibits 14 and 15 are admitted.

14       MR. BLACKSTONE:  If I might have a moment, your Honor?

15       THE COURT:  Yes.

16          (Brief Pause in Proceedings)

17       MR. BLACKSTONE:  I'm all done, thank you, your Honor.

18       THE COURT:  Okay.  Mr. Covell?

19       MR. COVELL:  Just perhaps one question.

20                          * * * * *

21            R E D I R E C T   E X A M I N A T I O N

22  BY MR. COVELL:

23    Q. Mr. Fard, turning to the government's Exhibit number 10, do

24  you have that in front of you there?

25    A. Yeah.

48

1    Q. And that is -- relates to some figure that was reported to

2    the mall?

3    A. Exhibit 10, and this one right here?

4    Q. In the government's exhibits?

5        THE COURT:  I don't think it's 10.

6        MR. COVELL:  It's not 10?

7    A. No.

8        THE COURT:  That's his passport.

9        MR. BLACKSTONE:  10 is the passport.

10        MR. COVELL:  Oh, I'm sorry.  Okay, it is seven.  Seven,

11    excuse me.

12    A. Yeah.

13    Q. (By Mr. Covell) Is there anything on there that says

14    "gross"?

15    A. No, because that's not a gross.

16        MR. COVELL:  I have no further questions.

17        THE COURT:  All right.  You may step down, Mr. Fard.  Thank

18    you.

19        MR. COVELL:  And we rest, your Honor.

20        THE COURT:  Okay.  Anything else, Mr. Blackstone?

21        MR. BLACKSTONE:  We have one rebuttal witness, your Honor,

22    Lewis Rayner from the Department of Corrections.

23        THE COURT:  Okay, Mr. Rayner.

24        MR. BLACKSTONE:  She will swear you in.

25        THE CLERK:  Please raise your right hand.  Do you solemnly

49

*ACE Reporting Services, Inc. (206) 467-6188*

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1   swear or affirm that the testimony you're about to give is the

2   truth, the whole truth, and nothing but the truth, so help you

3   God?

4        WITNESS RAYNER:  Yes.

5        THE COURT:  Please have a seat, and as soon as you do, state

6   your name.

7        WITNESS RAYNER:  Lewis Rayner, CCO Rayner, Department of

8   Corrections.

9        THE COURT:  Would you spell your last name?

10        WITNESS RAYNER:  R-A-Y-N-E-R.

11        THE COURT:  Thank you.  Mr. Blackstone?

12        MR. BLACKSTONE:  Thank you, your Honor.

13                          * * * * *

14                D I R E C T   E X A M I N A T I O N

15   BY MR. BLACKSTONE:

16     Q. Mr. Rayner, you work for the Washington State Department of

17   Corrections?

18     A. Yes, sir.

19     Q. And what is your position with DOC?

20     A. Community corrections officer.

21     Q. And --

22     A. Parole.

23     Q. -- are you responsible for supervising Mr. Fard?

24     A. I was at the time, yes.

25     Q. Do you see him in the courtroom here today?

                                                          50

1    A. Yes.

2       MR. BLACKSTONE:  Your Honor, if the record would reflect he

3    has identified the defendant Mr. Fard.

4       THE COURT:  The record will so reflect.

5    Q. (By Mr. Blackstone) When did you begin supervising Mr.

6    Fard?

7    A. When I returned from Iraq, so September 2003.

8    Q. And what was he being supervised for?

9    A. He was an out-of-state supervisee for manslaughter.

10   Q. Out of what state?

11   A. Oklahoma.

12   Q. Okay, and did Mr. Fard have to fill out a monthly offender

13   report for you?

14   A. Yes, sir.

15   Q. And did you explain to him what the purpose of that report

16   was and whether he had to be truthful or not on that report?

17   A. Yes, sir.

18   Q. What did you tell him?

19   A. Well the monthly report says that any information regarding

20   employment, residence, any new law violations, any supervision

21   violations --

22   Q. Okay.

23   A. -- so we can maintain records.

24   Q. If you could look for me at Exhibit 14; is that in front of

25   you there, Mr. Rayner?  It's got the exhibit number in the lower

51

*ACE Reporting Services, Inc. (206) 467-6188*

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1   right-hand corner.

2     A. Oh.  Okay.

3     Q. And take a look at that.  These are a series of offender

4   reports that were filled out by Mr. Fard, and see if you can --

5   do these come from your file, Mr. Rayner?

6     A. Yes, sir.

7     Q. And these were provided to you; how did you get these

8   forms?

9     A. Well we put a number of blank forms in the waiting room of

10  the Department of Corrections and as the offender comes in, they

11  fill out the form and they present it to the CCO when they're

12  called back to do their report date with their CCO.

13    Q. So he actually would have handed these to you?

14    A. Yes, sir.

15    Q. Okay.  What is the date of the most -- the top form there?

16    A. October 19, 2004.

17    Q. And what address does Mr. Fard tell you he's living at?

18    A. 1301 South Ridge Drive, Apartment 213, Renton, Washington.

19    Q. And on earlier forms he also listed that address as where

20  he was living?

21    A. Yes, sir, and I also went by that residence to verify that

22  he was living there; however, he was not there, but an Asian

23  female answered the door and told me that he was living there.

24    Q. Did you believe in October of '04 and the earlier months

25  that he was actually living at that address?

1    A. Yes.

2    Q. Did Mr. Fard ever tell you that he was living somewhere

3  else?

4    A. No.

5    Q. Did he ever tell you he was living at an address in

6  University Place, the address of 3660 Bridgeport Way?

7    A. No.

8    Q. Have you ever heard of that address before?

9    A. The first I heard of it was when I was contacted by I

10 believe it was Mr. Gutt, and he informed me that he was staying

11 there.  Prior to that, I had no idea.

12   Q. Is it important for you to know where the people you

13 supervise live?

14   A. Yes.

15   Q. Why is that important to you?

16   A. Well to monitor for compliance.  Part of the judgment and

17 sentence, and the rules of supervision for the Department of

18 Corrections, is that we may have to conduct searches to

19 monitor -- you know, to monitor compliance, if need be.  We need

20 to know -- if new law violations come up, we need to know where

21 he's at.

22   Q. These offender reports all list Mr. Fard's employer as the

23 Sweet Spot.  Did you believe that's where he was working?

24   A. Yes.

25   Q. Did you ever try to confirm whether he in fact was working

1  at the Sweet Spot?

2     A. I made phone calls, but I never got anything back.

3     Q. Did Mr. Fard ever tell you that the Sweet Spot was simply

4  supplying him with oils and incense, which he in turn was

5  selling?

6     A. Just supplying?  No, he told me that's where he was

7  working.

8     Q. Did he ever tell you he had his own business on the side,

9  that he was selling incense and oils?

10    A. No, sir.

11    Q. Okay.  Did you ask him to provide you with any sort of

12 paycheck from the Sweet Spot?

13    A. No.

14    Q. If you could look for me at Exhibit 15 -- there's another

15 exhibit in there.  It is separately marked from that packet, Mr.

16 Rayner.  It's a check.

17       THE COURT:  A single piece of paper.  It looks like this.

18       WITNESS RAYNER:  Oh.  Okay.

19    Q. (By Mr. Blackstone) Well my question, Mr. Rayner, do you

20 see that check in front of you, Exhibit 15?  Here, I've got

21 one -- this check is dated August 15 of 2002.  Were you

22 supervising Mr. Fard at that time?

23    A. What was the year?

24    Q. August 15 of 2002 is the date on the check?

25    A. No.

54

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1     Q. Okay.

2     A. I was not supervising him.

3     Q. So when you supervised him, you never asked him for a

4  payroll check from the Sweet Spot?

5     A. No.

6     Q. Okay.

7     A. He was transferred to me from another CCO who already

8  confirmed that or supposedly confirmed that.

9     Q. Okay.  Did Mr. Fard ever have permission from you to travel

10 to Canada during the time --

11    A. No.

12    Q. -- you supervised him?

13    A. No, definitely not.

14    Q. Would you have given him permission to do so?

15    A. No.

16    Q. Okay.  Have you filed a violation report on Mr. Fard?

17    A. Yes, sir.

18    Q. And what are the violations that you have alleged?

19    A. I don't have the violation report in front of me right now,

20 but I charged him with failing to obey all laws and I believe

21 changing residences without notifying the Department of

22 Corrections.

23    Q. Okay, and are those violations pending now in Oklahoma, or

24 where are they?

25    A. Yeah, from what I understand, they are pending in Oklahoma.

*ACE Reporting Services, Inc. (206) 467-6188*

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    Q. Okay.

2    A. It has to go back to the sentencing state.

3    Q. So you understand that when he's done here, he will go back

4    to Oklahoma to deal with those violations?

5    A. To my understanding, yes.

6    Q. All right.  I have nothing further.  Thank you, Mr. Rayner.

7    A. Um-hum.

8        THE COURT:  Mr. Covell?

9                    * * * * *

10           C R O S S - E X A M I N A T I O N

11   BY MR. COVELL:

12   Q. Mr. Rayner, during the time that you supervised Mr. Fard,

13   were you able to reach him by his cell phone -- cell phone

14   number?

15   A. Yes, I got him by his cell phone number, I believe.

16   Q. Pardon me?

17   A. Yeah, I don't recall, but I believe I got him by cell

18   phone.

19   Q. You didn't have any trouble getting a hold of him by

20   telephone?

21   A. I don't recall any trouble getting a hold of him.

22   Q. Thank you.

23       MR. COVELL:  I have no further questions.

24       THE COURT:  Okay.  Anything else, Mr. Blackstone?

25       MR. BLACKSTONE:  No, your Honor, thank you.

56

*ACE Reporting Services, Inc. (206) 467-6188*

1    THE COURT:  All right, thank you.  You may step down.

2  Any other witnesses?

3    MR. BLACKSTONE:  No, we rest, your Honor.

4    THE COURT:  Okay.  Would you like to percent argument?  Mr.

5  Blackstone, you can go first.

6  Your Honor, I guess the first issue is what the appropriate

7  burden of proof is.  We submitted an additional brief on --

8  addressing the Second Circuit case, and I think it is fairly

9  clear that after <u>Booker</u>, it is still going to be preponderance,

10 although there's no Ninth Circuit argument.

11  If the Court wants argument on that, I will defer to Mr.

12 Cohen; otherwise, we will just submit it on the briefs.  Would

13 you like to hear --

14    THE COURT:  Yeah, I would, actually.

15    MR. BLACKSTONE:  Okay, let me --

16    THE COURT:  So --

17    MR. BLACKSTONE:  -- defer to Mr. Cohen, then.

18    THE COURT:  Okay.

19    MR. COHEN:  Again, very briefly, I think the Second Circuit

20 case covers it in terms of with respect to some of the <u>Booker</u>

21 issues.

22  On the forfeiture itself, that is an indeterminate punishment.

23 The statute is clear that criminal forfeitures provide for the

24 forfeitures of all proceeds, or in the case of drug cases,

25 facilitating property.

1    There is no statutory maximum, and on that basis I think the

2  Second Circuit then determined that <u>Booker</u> did not affect the

3  burden of proof as it applies to the criminal forfeiture

4  determinations.

5    That is consistent with all of the cases from all of the

6  Courts of Appeal post <u>Aprendi</u> (phonetic) where this issue was

7  raised.  It was raised after <u>Blakely</u>, and we cited those cases to

8  the Court.  I think there was a Sixth Circuit case there, and a

9  Seventh Circuit case, and then post <u>Booker</u>, there has been, to my

10  knowledge, no case that has held that the burden has shifted to

11  beyond a reasonable doubt.  It is all preponderance.

12    And the Ninth Circuit case weighed in after <u>Aprendi</u>, which is

13  also cited in our brief, established that preponderance is the

14  appropriate standard in this circuit, so unless and until the

15  Ninth Circuit rules otherwise, I believe that it is appropriate

16  to make a finding for forfeiture by a preponderance, consistent

17  with what is both in the Federal Rules of Criminal Procedure and

18  affirmed by the case law.  Thank you.

19    THE COURT:  Okay.  Thank you.

20    So Mr. Blackstone, on the factual issues, do you wish to

21  argue?

22    MR. BLACKSTONE:  Sure.

23    THE COURT:  Okay.

24    MR. BLACKSTONE:  I do.

25    THE COURT:  Well why don't you go ahead, then.

1     MR. BLACKSTONE:  Your Honor, briefly, the issue here is

2  whether the $10,000 in cash that was used to buy the 1994 Lexus,

3  whether those funds are traceable to proceeds from a bank fraud

4  scheme.

5     There are a number of facts that are not in dispute.  One, we

6  know the defendant was an active and integral participant in a

7  fairly extensive bank fraud scheme that went from January of 2002

8  until November of 2004.  He pled guilty to a conspiracy charge,

9  admitting that he was involved in the scheme during that

10 timeframe.

11    Agent Gutt testified that the loss from the scheme was in

12 excess of $300,000, but because money is fungible and hard to

13 trace, I can't put $300,000 in Mr. Fard's pocket.  Money was

14 going every which way in this scheme.

15    As part of the plea agreement, Mr. Fard did admit that he was

16 responsible for at least $49,000 of the cash.  We believe it is

17 much higher than that, but I can't prove that to any degree of

18 certainty.

19    So we know he was getting an awful lot of money from this bank

20 fraud scheme.  We know that when he was arrested in November of

21 '04, he was still involved in it.  There were Manpower checks on

22 his computer.  There were two phony cashiers checks in his car.

23    We also know that he had no reported wages to the state of

24 Washington during the timeframe he's been in Washington.  We know

25 he has filed no tax returns, so there's no legitimate record of

59

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    any legitimate income that he has had.

2        I think it is fair to infer from that that he was living off

3    the proceeds from his fraud.

4        Now the defendant has come forward and said, Well, the money I

5    used to buy the Lexus was really clean money, and he has

6    identified resources.  The first source he said is this incense

7    business that he and his brother operated at the Tacoma Mall.  He

8    claims that from September of '03 until sometime in November of

9    '03, they had a little kiosk there, and they were selling incense

10   and oils.  He claims that he got a little over $11,000 in net

11   income from that business for three months.  He claims that he

12   used a portion of it to live on, but by the time he bought the

13   car, there was still $4000 left, and he used that money to buy

14   the Lexus.

15       Well I think there's some problems with his testimony.  First

16   and foremost is that we don't have very good records.  What the

17   Court has seen is a handwritten ledger that shows how much money

18   they brought in day in and day out.  There is absolutely no

19   supporting documentation for that ledger.  There are no cash

20   register receipts, there are no invoices nor sales receipts.

21   Although the defendant claims he had those documents at one

22   point, he claims he had them at the same time he had the ledger;

23   they are nowhere to be seen.  He is speculating his wife threw

24   them out.

25       I think it is interesting that the only records he really has

1    are those records showing what his expenses were, so we don't

2    have terribly legitimate records showing what his income was.

3        And additionally, we show that he never reported, except for

4    one month, what the gross sales were to the Tacoma Mall.  You

5    would think that if they had gross sales in October and November,

6    they would have made those reports, because somebody reported

7    gross sales in September.  He claims he had no idea he had to do

8    this, although if you look at the lease agreement, he signed a

9    lease agreement, and I've got to assume that the Tacoma Mall

10   would have told him that in addition to the $1700 a month, you've

11   got to pay a percentage of your gross sales.  I would think with

12   any mall that would be the first thing they would explain to him,

13   but there are no gross sales reported for those two other months.

14       Additionally, we don't have him paying a dime of sales tax to

15   the state of Washington, and I believe his brother testified that

16   they were charging people sales tax.

17       That money does not belong to the defendant, it belongs to the

18   state of Washington, so essentially they are stealing that money

19   from the state of Washington and pocketing it.  Again, he claims

20   he didn't know.  Well, he has been in business we think for at

21   least three years running his own business.  At some point it

22   would have dawned on him that he had to file and pay state sales

23   tax.

24       We submitted a letter to the Game, Inc., which is his company.

25   He claims he never saw that letter.  That was Exhibit 4.



1    We then also have the fact that he was not truthful with his

2    probation officer about where he worked.  He told his probation

3    officer that he worked for the Sweet Spot; that wasn't true.  Why

4    wasn't he telling the probation officer about the Tacoma Mall?

5    Next the defendant claims he got $4000 from his mother-in-law;

6    apparently she came down sometime in February of '04 after they

7    had their baby and gave his wife $4000 in cash.

8    We heard the mother testify, and the mother said a couple of

9    interesting things.  One, she said she and her husband are

10   successful businesspeople in Vancouver.  The husband runs a

11   restaurant and she runs a cleaning service.  She operates a

12   number of bank accounts.  She's not afraid of banks, apparently,

13   like the defendant is.

14   I think that is significant because when you have a lot of

15   bank accounts, why do you come across the border with $4000 in

16   cash?  Why do you run the risk of being stopped at the border and

17   searched?  Why do you run the risk of having that money stolen

18   from you, either in your vehicle or wherever you're staying?

19   I mean the fact that the mother uses bank accounts -- it

20   doesn't seem consistent that she would come down with cash.

21   Also the exhibits submitted by the defense showed a number of

22   wire transfers from the mother in relatively small amounts of

23   money:  $300, $400.  Those are in Exhibit A1.

24   So I submit that the mom's testimony that she brought $4000 in

25   cash -- there's no documents to corroborate it.  She couldn't

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1    produce a single bank record to show that she had withdrawn $4000

2    from a bank account, although she testified she had a number of

3    bank accounts.  I think she said she had four or five bank

4    accounts.

5        So we have no way of tracing where this money came from.  Mom

6    clearly has an incentive to help her daughter and her son-in-law

7    get the car back, which she apparently paid for.

8        So I think that a lot of what the mother says we can't --

9    there's no way prove it or disprove it.

10        And then finally, the defendant claims he got $2000 in a loan

11    from his brother, and I submit that that is also bank fraud

12    proceeds.  There is no evidence that the brother did anything

13    other than was involved in the bank fraud.  He too has pled

14    guilty to the conspiracy count.  He too is in prison serving a

15    sentence and we submit that there is absolutely no evidence that

16    that money can be traced to a legitimate source.

17        Essentially what the defendant wants the Court to believe is

18    that he had all this money floating around, a lot of which came

19    from bank fraud, but somehow he segregated out the bank fraud

20    money from this $10,000 in clean money, and he kept that separate

21    and apart and pure and used only that money to buy the Lexus.

22        We submit that doesn't make a lot of sense; that if there was

23    legitimate money, it was commingled with all of his other fraud

24    money, and it is very difficult for him to say that somehow he

25    kept all this money clean.



1    And finally, I think the most important thing for the Court is

2    what is really at issue here and that is the defendant's

3    credibility.  I mean this really comes down -- a lot of this

4    stuff we can't prove one way or the other; a lot of it comes down

5    to whether you believe the defendant, and there's a lot of

6    reasons to find this defendant not credible.

7    First of all, he stands convicted of bank fraud, which is a

8    crime of dishonesty.  He was involved in a scheme, which

9    consisted of creating false check after false check, deceiving

10    bank after bank, so he is a convicted -- convicted of fraud,

11    which should reflect poorly on his credibility.

12    We know he didn't provide the gross sales figures to the

13    Tacoma Mall.  We know that he didn't pay any taxes to the state

14    of Washington, cheating the State out of tax revenues.  And we

15    now know from the witness stand that he lied repeatedly over and

16    over and over again to his probation officer.

17    Month in and month out he told the probation officer, I work

18    for the Sweet Spot.  He gave a phone number that comes back to

19    his brother's cell number.  He clearly was trying to deceive and

20    mislead his probation officer about what he did.

21    We also know that he lied to the probation officer about where

22    he lived.  He claimed on the witness stand that, Well, no, I told

23    Mr. Rayner I lived in University Place, although I didn't put

24    that on my form.  We called Mr. Rayner and Mr. Rayner said, No,

25    the defendant never told me where he lived.  And Mr. Rayner

*ACE Reporting Services, Inc. (206) 467-6188*

1    wanted to know where he lived because he wanted to check up on

2    him to make sure that he wasn't engaged in criminal conduct, and

3    had he gone to that University Place address, he would have found

4    a check fraud scheme in operation right there, so there's a

5    reason why Mr. Fard lies to his probation officer.

6        So I think when you look at his credibility, it is worth

7    nothing, and I think without his credibility, a lot of his

8    testimony about where this money came from is not believable, and

9    we would request that the Court conclude that the money came from

10   the bank fraud proceeds and order the vehicles forfeited to the

11   United States.  Thank you.

12          THE COURT:  All right, thank you.  Mr. Covell?

13          MR. COVELL:  Thank you, your Honor.

14       Your Honor, of course the issue is not whether Mr. Fard

15   reported his income properly or at all; the question is whether

16   the government can sustain their burden of proof that the

17   purchase of this car was traceable to funds from this offense,

18   and as to the burden of proof, it is our position that it should

19   be beyond a reasonable doubt.

20       This is a principle that has been enunciated in Aprendi and

21   then Blakely and Booker, and that being that any fact other than

22   a prior conviction necessary to support a sentence exceeding the

23   maximum authorized by the facts, established by a plea of guilty

24   or a jury verdict, must be admitted by the defendant or proved

25   beyond a reasonable doubt.



Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF Complete

1      The District Court in Nebraska, Judge Bataillon, has I think

2   done a careful analysis of the <u>Booker</u> decision, and he observes

3   that the due process line separating a sentencing factor from an

4   element of the crime remains blurred, and that although <u>Booker</u> in

5   Sixth Amendment terms may not require proof beyond a reasonable

6   doubt under a due process analysis that flows from Aprendi into

7   <u>Booker</u>, that any fact which is being asserted as a basis for an

8   increased punishment that the defendant has not admitted, or

9   found by the jury, then it must be proven beyond a reasonable

10  doubt, and we would submit that the facts in issue here are facts

11  obviously not admitted by the defendant; they do have an impact

12  on his sentence, his penalties, and therefore they should be

13  proven beyond a reasonable doubt.

14      In terms of the analysis of the evidence itself, we would

15  refer the Court to a case cited by the government, <u>US v. Garcia-</u>

16  <u>Geyser</u> (phonetic).  It is cited in their brief and also cited in

17  one of our responses to the government.

18          THE COURT:  I see it.

19      MR. COVELL:  Okay, that was a case involving a defendant who

20  had been convicted following a jury trial of multiple counts of

21  drug distribution and one count of drug conspiracy involving this

22  drug distribution.  There was also one count of possession with

23  intent to distribute marijuana.  The earlier counts were dealing

24  with methamphetamine, and in this particular case the jury found

25  him guilty of all those counts and they also found that $43,000

66

1    that was located in his storage locker was properly forfeited to

2    the government.

3        On appeal the Ninth Circuit said that that's not how this case

4    should have been decided; that there was not sufficient evidence

5    for that sort of decision, and in doing so they looked at the

6    fact that we had evidence that the defendant had admitted that

7    $10,000 came from marijuana sales; that there was a false name

8    used for renting the storage locker; that a separate bank account

9    existed that the government asserted meant that that would have

10   been the account the defendant would have used if they were

11   legitimate funds, and the government also argued that they

12   were -- oh, drug sales sheets that were found in the defendant's

13   residence, and yet in spite of all of that, the Ninth Circuit

14   reversed and held that the only funds that were traceable were

15   the buy funds, the $4300 worth of buy funds, and otherwise this

16   was not a case that the government could proceed by way of

17   forfeiture for any amounts in excess of the $4300.

18       In this case we have no evidence that Mr. Fard obtained any

19   bank fraud proceeds from the summer preceding -- from the summer

20   of '03 until after he purchased the car in March of '04.

21       Mr. Fard has testified that he had no proceeds during that

22   period of time, and we have had no evidence to rebut that.

23       Mr. Fard was engaged in a legitimate business.  Certainly the

24   records demonstrate both from the mall and from Mr. Fard that

25   there was an incense and oils business operating at the Tacoma

67

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1  Mall.  We presented testimony as to the amount of funds that were

2  received, and we presented testimony about his living expenses,

3  the amount of funds that he has testified that were distributed

4  to him came to a total of $11,400; his living expenses for the

5  four months from September through December came to $5,000; his

6  expenses in January and February, excluding his transportation

7  expenses, are another $2340, so that he had $7,340 in expenses,

8  and that from the $11,400 that he received from the incense and

9  oils business leaves an amount of $4060.

10    Mr. Fard's mother-in-law has testified.  She has come down

11  here and come into court, and she has testified truthfully.  I

12  think no one could have heard her testimony without thinking that

13  she was anything other than truthful.

14    She is from the old world.  She talked about keeping a safe in

15  her home, and putting monies into her safe in her home, so she's

16  not one that always uses the bank for each and every transaction.

17    So it is clear from the evidence, from her testimony, that she

18  did in fact give Mr. Fard and his wife $4000 for the purchase of

19  this automobile.  It was close to that -- to the purchase in

20  time, and Mr. Fard has testified as to how he thanked his mother-

21  in-law for the money, and indeed she was in the habit of giving

22  them money throughout their marriage, and has testified about

23  doing that, as well.

24    We also know from the documentation that has been admitted

25  regarding her business and finances that she and her husband are

68



1    business owners; that they own substantial property; that they

2    have financial accounts that would serve as a basis for the gift

3    of the $4000, and of course you heard testimony about her love

4    for her daughter, which I thought was very -- was quite profound.

5        We have also had testimony from Mr. Fard about receiving $2000

6    in a loan from his brother.  His brother had been working at the

7    mall.  That's clear.  His brother also had a source of money from

8    his -- unfortunately, his children, and so he had a basis for --

9    it's only $2000, and that was borrowed from him by the defendant.

10       The government has argued that Mr. Fard is asking us to talk

11   about how he segregated funds and all of this, but I would say

12   that that's -- we don't need to get to that point, by any stretch

13   of the imagination.  Mr. Fard was living day-to-day and the

14   amount of funds that he had in the point of time that we are

15   concerned about, March -- early March of '04 is -- are clearly

16   demonstrated to be funds that are legitimate; they were earned

17   honestly, and because of that, the government cannot say that it

18   has met its burden of proof, and it is appropriate that this

19   court find that these -- that this car not be forfeited, and that

20   it be returned to Mr. Fard.

21       THE COURT:  Mr. Covell, just a question, and that I will ask

22   Mr. Blackstone the same question:  What if it was found that some

23   of the funds used to purchase the Lexus were not legitimate

24   funds; what would the result of that be?

25       MR. COVELL:  Well I would assume the Court would make some

*ACE Reporting Services, Inc. (206) 467-6188*

1   percentage allocation --

2       THE COURT:  Right.  Right, or a specific dollar amount, but

3   practically speaking, what would the impact of that be?

4       MR. COVELL:  You mean the mechanics of --

5       THE COURT:  Yes.

6       MR. COVELL:  -- carrying that out?

7       THE COURT:  Well I mean if part of the funds were found to

8   be not legitimate, that doesn't immunize the rest of the funds.

9   Let me pose the flipside:  If some were found to be legitimate,

10  that would not immunize the car from being forfeited in the event

11  that some were found to be not legitimate.  There might be a

12  rebate if the car were sold and excess funds beyond the

13  illegitimate funds were realized.

14      MR. COVELL:  I would assume --

15      THE COURT:  Wouldn't that be true?

16      MR. COVELL:  -- that would be the way the Court --

17      THE COURT:  Okay.

18      MR. COVELL:  -- would have to proceed.

19      THE COURT:  I would think so, too.

20   I just wondered.  Okay, thank you.  Mr. Blackstone?

21      MR. BLACKSTONE:  That's correct, your Honor, assuming you

22  find that the $4000 from the mother is legitimate, that is 40%;

23  the vehicle would be sold.  60% would come to the government and

24  40% would go back to Mr. Fard.

25   They would take, though, the storage costs out of the

70


Click Here & Upgrade
Expanded Features
Unlimited Pages
Complete

1    proceeds, and the storage costs today are about $1000, so, you

2    know --

3         THE COURT:  Out of the gross or out of --

4         MR. BLACKSTONE:  Gross.

5         THE COURT:  -- the portion that was forfeited?

6         MR. BLACKSTONE:  It comes out of the gross.

7         THE COURT:  That was subject to forfeiture?

8         MR. BLACKSTONE:  It comes out of the gross, so if the

9    vehicle sells for $7,000, they take a thousand off the top, and

10   there would be $6000 remaining.  Hypothetically, 60% would go to

11   the government and 40% would go to the defendant.

12        THE COURT:  Okay.

13        MR. COVELL:  If the Court is inclined to go that way, we

14   would ask that whatever portion goes to the defendant, though, be

15   applied towards restitution.  He's got a $30,000 restitution

16   obligation, so I don't think he should benefit from the sale of

17   this vehicle.

18        THE COURT:  Well, would I be expected to set forth the

19   formula for doing that, or does that simply operate by law once

20   there is a finding as to what portion is attributable --

21        MR. BLACKSTONE:  I think then the marshals would just -- if

22   the Court finds 60% government -- 80% -- whatever number you come

23   up with, when the car is sold, then the marshals would divvy up

24   the money based on your percentages.

25        THE COURT:  Okay.

Click Here & Upgrade
Expanded Features
Unlimited Pages
PDF
Complete

1      MR. BLACKSTONE:  So -- But let me just address two points

2  raised.

3      THE COURT:  But we'll come back to that, Mr. Covell.  You

4  can be heard as soon as he is finished.

5      MR. BLACKSTONE:  Two points raised by Mr. Covell.  First of

6  all he says that there is no evidence that Mr. Fard got any fraud

7  money during the timeframe from September of '03 until March of

8  '04; that is not correct, your Honor.  He admitted to being

9  involved in this scheme that went from January of '02 to November

10  of '04.

11     Can I put money in his pocket -- not -- I can't tell you what

12  day he got money, but there's a lot of money floating around

13  there.  He admitted to being involved in the conspiracy during

14  that timeframe.  He didn't say he wasn't involved in it during

15  that period, so I think it is fair to infer that there was still

16  money coming in from the bank fraud scheme based on his own

17  guilty plea.

18     And the second thing I want to address is Mr. Covell can parse

19  everything out and say there's money coming from here and money

20  coming from there; the problem is there's no proof of this.

21  Everything is cash.  The defendant claims he had $11,000 from the

22  business; although he thought he might have a bank account, he

23  didn't put a dime of that into a bank account, so we have no

24  records of how much he got, if anything.

25     The $4000 from the Mom, that's cash again.  There's no bank



Click Here & Upgrade
Expanded Features
Unlimited Pages

1  withdrawals from the mom's bank account in Vancouver.  There's no

2  deposits of the money into a bank account.

3     And again, the $2000 from the brother, that's all cash.  It's

4  not from a checking account, so the Court has absolutely no

5  documentary proof of where this money came from, which goes back

6  to the central question here, which is the defendant's

7  credibility.

8     If you find he is not credible, I think all of their arguments

9  fall by the wayside, because he wants you to believe him when he

10  tells you this money came from good clean sources, yet he can't

11  give you a single document to prove that this money was

12  legitimately gained, and when you look at his credibility, I

13  think his credibility is worth very, very little, your Honor.

14  Thank you.

15         THE COURT:  Okay, thank you.  So Mr. Covell?

16         MR. COVELL:  I was just going to put forth that perhaps the

17  storage costs should also be allocated; if there is some

18  percentage decision made by the Court, that that also would

19  affect storage charges, and just finally, Mr. Fard did testify

20  that he did not engage in any fraudulent activity during this

21  time period, so I think the record is clear on that.

22         THE COURT:  Okay, on this issue of allocating storage costs,

23  determining the percentage and what happens next, do you have any

24  authority on that, Mr. Blackstone, that says, for example, what

25  Mr. Covell suggested is not the way to go, or is that just a

1   finding that the Court could make either way?

2       MR. BLACKSTONE:  Mr. Cohen, who is our resident forfeiture

3   expert, said it is more a matter of practice --

4       THE COURT:  Uh-huh.

5       MR. BLACKSTONE:  -- that the storage costs come off the top,

6   but I think the Court could apportion the storage costs, if you

7   wanted to.

8       THE COURT:  Okay.  Based on whatever seems equitable or

9   appropriate?

10      MR. BLACKSTONE:  But if the Court is going to do that, we

11  would highly request that you order his portion be paid to

12  restitution.  It shouldn't go back to him --

13      THE COURT:  Um-hum.

14      MR. BLACKSTONE:  -- to benefit.

15      THE COURT:  And how much --

16      MR. COVELL:  I'm not sure whether the Court would have -- is

17  that issue before the Court properly to make that sort of

18  determination?

19      MR. BLACKSTONE:  Well there is a restitution order of about

20  $37,000, which was imposed by Judge Coughenour, so I think if he

21  gets a windfall, that money should go back to the victims.

22      THE COURT:  Well on that, I think what I'm doing is

23  basically along the lines of a report and recommendation, anyway,

24  or appealable to -- so if I were not to make that provision as to

25  where the funds would go, Judge Coughenour clearly could do that,

74

*ACE Reporting Services, Inc. (206) 467-6188*

1    so I think what I would do is make a recommendation one way or

2    another, and leave it to Judge Coughenour to make that

3    determination, because to some extent that's reserved to the

4    sentencing judge -- and to some extent not.  I think it is a bit

5    of a gray area, but obviously sentencing issues, and any change

6    in sentencing or the judgment would have to go to the sentencing

7    judge.  This isn't exactly doing that, but it is kind of in the

8    ballpark, so I think what I would do would be to leave that to

9    Judge Coughenour.

10         MR. BLACKSTONE:  All right.

11         THE COURT:  But I would make a recommendation.  And Mr.

12   Fard, why don't you talk to Mr. Covell about what you would like

13   to say first.

14             (Brief Pause in Proceedings)

15         MR. COVELL:  Mr. Fard is raising the ownership interest,

16   that his wife is a part owner, but of course -- and I'm telling

17   him -- excuse me, that that issue is not what the Court is

18   resolving today.

19         THE COURT:  Also true.  Yes.

20      Okay, thank you very much.  Is there anything else we should

21   discuss today?  Perhaps -- Let me make sure we're on the same

22   page.  Just to make sure we have the exhibits admitted that

23   should be admitted, those that were offered by the government

24   that -- well, the government offered Exhibits 1 through 15, or

25   had ready to offer Exhibits 1 through 15; those that were

75

*ACE Reporting Services, Inc. (206) 467-6188*



1    admitted consisted of 1 through 5, 7 through 10, and 12 through

2    15.

3         MR. BLACKSTONE:  That's correct, your Honor.

4         THE COURT:  I believe.  Okay, good.  And then Mr. Covell,

5    your exhibits offered were -- or I should say available to be

6    offered, they were in the binder, A1 through A8.  The admitted

7    exhibits were A1 through A3, and A8.

8         MR. COVELL:  I think A4, 5, and 6 were also --

9         THE COURT:  Okay, I've got blanks for that.  Oh, that's

10   right, we did that today.

11        MR. COVELL:  So everything you've got except A7.

12        THE COURT:  Good.

13        MR. BLACKSTONE:  Thank you.

14        MR. COVELL:  Okay.

15        THE COURT:  Okay.

16        MR. COVELL:  Thank you, your Honor.

17        MR. BLACKSTONE:  Thank you, your Honor.

18        THE COURT:  Thank you.

19        THE CLERK:  All rise, the Court is in recess.

20             (End of proceedings for 7/26/2005)

21

22

23

24

25

*ACE Reporting Services, Inc. (206) 467-6188*



C E R T I F I C A T E

I, Brian Killgore, do hereby certify:

That ACE Reporting Services, Inc., is a court-approved transcription company for the state of Washington, counties of King and Cowlitz, and for the United States District Court for the Western District of Washington;

That the annexed and foregoing transcript of electronically recorded proceedings was transcribed by me to the best of my ability;

I further certify that I am not a relative or employee or attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or outcome thereof;

I further certify that the transcript is a true and correct record of all audible portions of the taped testimony, including questions and answers, and all objections, motions and exceptions of counsel made at the time of the foregoing proceedings. Areas of the tape(s) or CD(s) that were not decipherable for any reason are noted as [INAUDIBLE].

Dated this 4th day of September 2005.


/Brian J. Killgore /

Brian J. Killgore
ACE Reporting Services, Inc.
1900 West Nickerson Street
Suite 209
Seattle, WA 98119-1650
(206) 467-6188

Notary Public in and for the
State of Washington,
Residing at Seattle.

My commission expires 11/1/2008

*ACE Reporting Services, Inc. (206) 467-6188*